### FOLEY BROS. DRY GOODS CO. v. McCLAIN et al. (No. 677.)

(Court of Civil Appeals of Texas. Beaumont. May 20, 1921. Rehearing Denied June 1, 1921.)

1. **Libel and Slander �köö89(1)—Petition held to state cause of action, though not alleging special damages.**

Petition of store employé against the company operating the store alleging a slander by having charged her with theft *held* to state a cause of action, the utterance or statement complained of being slander per se, so that the petition did not need to allege special damages. .

2. **Libel and slander �köö41—No recovery in case of qualified privilege unless malice present.**

There can be no recovery for a slanderous utterance made under circumstances entitling it to a qualified privilege unless defendant's agent, in making the statement, was actuated by actual or express malice, or other evil motive.

3. **Libel and slander �köö45(2)—Statement of store manager relative to theft by employé held qualifiedly privileged.**

Utterance or statement, charging female employé of large store with thievery, made by the store's manager in his office in the presence of other executives and employés when he was investigating a claim of theft *held* qualifiedly privileged and not to be made a basis for damages, actual or exemplary, unless the employé charged with the theft could show the statement was actuated by actual or express malice or want of good faith.

4. **Libel and slander �köö101(4) — Plaintiff has burden in case of qualified privilege to show statement was actuated by malice.**

Where a slanderous utterance is shown to have been conditionally privileged, plaintiff must take the burden of showing that it was actuated by actual or express malice or want of good faith.

5. **Libel and slander �köö112(2)—Evidence insufficient to justify finding of malice in making charge of theft.**

In an action by a female store employé against the company for slander by its manager in charging her with theft, evidence *held* insufficient to warrant the jury's finding that the manager's utterance, made under conditions entitling it to a qualified privilege, was actuated by actual or express malice.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by Hazel McClain and another against the Foley Brothers Dry Goods Company. From judgment for plaintiffs, defendant appeals. Judgment reversed, and cause remanded.

Garrison, Pollard, Morris & Berry, and Maurice Epstein, all of Houston, for appellant.

Wm. Masterson and Samuel Schwartz, both of Houston, for appellees.

HIGHTOWER, C. J. This was an action for slander brought by the appellee, as plaintiff below, against the defendant, and resulted in a verdict and judgment in favor of the plaintiff for $3,000, from which this appeal was prosecuted. We find in appellant's brief what seems to be a sufficiently full and clear statement of the nature and result of the suit, and which is in no respect questioned by the appellees, and the same is adopted by this court, as follows:

"This suit was instituted by Hazel McClain, a minor, through her father, Thomas McClain, as next friend, to recover both actual and exemplary damages alleged to have been sustained by her by reason of certain alleged slanderous statements made by the appellant. She alleged in her petition substantially as follows:

"That on or about the 14th day of November, 1918, she was employed by the defendant (appellant), Foley Brothers Dry Goods Company, as a wrapper of goods and merchandise in the neckwear department, on the first floor of the store; that on or about said date, and while so employed, a co-worker of the plaintiff on said floor, to wit, a saleslady by the name of Bessie York, brought a package of goods to the plaintiff unwrapped, with the request that the

plaintiff wrap the same, as it was her duty to do; that Bessie York presented therewith a duplicate slip, which showed the value of the goods to be $4.50, stating at the time to the plaintiff that same had been paid for by her, and requested of plaintiff that no charge check be entered therefor; that she believed and relied upon the statements made by said Bessie York, and acting upon the truth thereof, having no reason to doubt the same, if, in fact, said statements were false, which is not admitted, but expressly denied, and so believing, she wrapped the said package of goods as she was requested to do, attaching thereto, as is customary in such cases, a duplicate slip, delivering the same to the cashboy to be carried to the delivery department; that shortly thereafter the package was returned to her unwrapped, with the request that she furnish duplicate check; that she advised the party so requesting that the duplicate check was attached to said package when delivered to the cash boy, and that she was unable to attach said duplicate slip; that shortly thereafter she was approached by one Muenster, an employé of the defendant as floorwalker, who had charge of the floor, who demanded of plaintiff the duplicate check or slip for said goods, and that he was advised by the plaintiff that the same was delivered to the cash boy; that notwithstanding her statement or explanation, she was then required by said Muenster to go with him to one Fred Kennedy, who was the superintendent of defendant's store, and who, in such capacity as superintendent, had authority to hire and discharge employés, including the plaintiff, who also interrogated the plaintiff regarding said package, and the duplicate slip, and who was likewise advised by plaintiff that same had been wrapped, and said slip attached under the circumstances as heretofore stated; that thereupon the said Kennedy stated to the plaintiff in a loud voice, and in the presence and hearing of various other parties, that the goods had been stolen, and that plaintiff was implicated in the thievery, or as much to blame therefor as the said Bessie York, meaning and intending to say thereby that both the plaintiff and Bessie York were guilty of the theft of said goods.

"The plaintiff further averred that she was then required by said Kennedy, as superintendent, to go to one George Cohen, who was the manager of said defendant's store, and who has some interest therein, as a member thereof, who likewise interrogated the plaintiff regarding the wrapping of said package and the duplicate slip attached thereto, and that said Cohen then and there told plaintiff and said Cohen to her in a loud voice, and in the presence and hearing of one Muenster and Kennedy, and various other persons whose names are to the plaintiff unknown, that she, plaintiff, was as much implicated in the thievery of said goods as was the said Bessie York, thereby charging and meaning and intending to charge and say that both the plaintiff and the said Bessie York were guilty of theft of goods; that she immediately thereafter was discharged.

"Plaintiff averred that she had nothing whatever to do with said articles of merchandise except as above alleged, and after having made said explanation, the said agents, servants, and employés of the defendant company falsely intending to injure the plaintiff, and to bring her into public disgrace, scandal, shame, and humiliation, and to injure her in her good name, fame, credit, and reputation, did falsely, wickedly, maliciously speak and publish said charges, statements and accusations to and of and concerning this plaintiff, to her great damage, viz., $10,000 actual damages, and punitive damages $5,000.

"The defendant answered by general and special demurrers, general denial, and specially alleged that, if said statement was made, the same was a privileged communication, and was not made in the hearing or presence of any one save and except the employés of the defendant company whose duty it was to investigate and truthfully ascertain the true facts surrounding the wrapping of said package, and that said statements, if made, were made in the discharge of their duty that they owed to the defendant company, its officers and representatives.

"The case was submitted to the jury upon special issues, which special issues and the answers thereto are as follows:

"'Special Issue No. I: Did or did not parties other than Mr. George Cohen, Mr. Fred Muenster, and Mr. John Kennedy hear the statement set out in plaintiff's petition by and between them and Miss Hazel McClain in Mr. George Cohen's private office?'

"'To which the jury answered: 'They did.'

"'Special Issue No. II: Give the name or names of the parties who overheard the statement set out in plaintiff's petition.'

"'To which the jury answered: 'Parties unknown to us.'

"'Special Issue No. III: Did or did not the parties who heard said statement understand what was said at the time same was uttered?'

"'To which the jury answered: 'They did.'

"'Special Issue No. IV: Did or did not the parties who heard said statement understand to whom it was said at the time same was uttered?'

"'To which the jury answered: 'They did.'

"'Special Issue No. V: Was or was not such statement actuated by malice toward the said Hazel McClain as the term "malice" will be hereinafter defined?'

"'To which the jury answered: 'It was.'

"'Special Issue No. VI: What amount of actual damages, if any, do you find the plaintiff, Hazel McClain, entitled to recover herein by reason of said statement so made to her?'

"'To which the jury answered: '$1,500.'

"'Special Issue No. VII: What amount of exemplary damages, if any, do you find the plaintiff, Hazel McClain, is entitled to recover herein by reason of said statement so made to and about her?'

"'To which the jury answered: '$1,500.'"

By supplemental petition filed, plaintiff joined issue with defendant on its plea of privilege, both in law and on the facts. After the verdict of the jury had been returned, the defendant moved to set the same aside, which motion was overruled, and judgment was entered upon the verdict in favor of the plaintiff for $1,500 actual and $1,500 exemplary damages. Afterwards, defendant filed its motion for new trial, which was also overruled.

By the first assignment of error, complaint

is made that the trial court erred in overruling appellant's general demurrer. It is contended that this action of the court was error, because the petition did not state a cause of action against appellant, in that it failed to allege any slanderous or defamatory statement concerning plaintiff involving the commission of a crime. Also, it is contended that the petition failed to allege in haec verba any language used by appellant concerning the plaintiff that could be made the basis for slander, or that imputed to plaintiff the commission of any crime, or which charged plaintiff with an offense upon which an action could be predicated. Also, it is contended that the petition failed to allege special damages, and that, since the language attributable to appellant, the use of which plaintiff complained of, was not actionable per se, the petition showed no cause of action, in the absence of an allegation of special damages.

[1] After careful consideration of this assignment, we have reached the conclusion that it cannot be sustained. The natural and reasonable inference or conclusion that would be drawn by the ordinary mind from the statement and language alleged to have been made and used to and concerning appellee by defendant would be that appellee was implicated criminally in the theft of goods, or, in other words, that she was guilty of a criminal offense. Therefore the utterance or statement complained of, as shown in the petition, was slanderous per se, and, this being so, it was not necessary, in order to show a cause of action, that the petition should allege special damages. Belo v. Fuller, 84 Tex. 450, 19 S. W. 616, 31 Am. St. Rep. 75; Publishing Co. v. Jones, 83 Tex. 302, 18 S. W. 652; Baten v. Houston Oil Co., 217 S. W. 394. In the last-mentioned case, the authorities are fully reviewed by Associate Justice Walker, who wrote the opinion in the case. The first assignment will be overruled.

By the second and third assignments, complaint is made of the action of the trial court in overruling certain special exceptions interposed by appellant to the plaintiff's petition. We have given them consideration, but think they are untenable, and, without further discussion, overrule them.

The fourth and fifth assignments complain of the refusal of the trial court to peremptorily instruct a verdict in favor of appellant. The theory of appellant upon which the peremptory instruction was requested was, and the contention here is, that the uncontradicted evidence in the case showed conclusively, that the statement or utterance or charge sought to be made the basis of this suit was, in contemplation of law, a privileged communication; and further, that there was no evidence whatever showing or tending to show that defendant's manager, Cohen, in making such statement, charge, or utterance, was actuated by actual or express malice, or by any evil motive, and that therefore the verdict should have been instructed in favor of appellant.

The sixth and seventh assignments, in effect, complain of the refusal of the trial court to grant appellant a new trial, on the ground that the communication, utterance, or charge complained of was shown by the undisputed evidence to be privileged, and that the evidence was insufficient to warrant the finding of the jury that appellant was actuated by actual or express malice in making such utterance, statement, or charge to and concerning the appellee.

It is the contention of counsel for appellee that the statement or charge of which appellee complains was not privileged, either absolutely or conditionally, and that, since the statement or utterance complained of was slanderous per se, it was not necessary, in order to a recovery by her of actual damages, that actual or express malice on the part of appellant be shown. Appellee further contends that if the occasion on which the utterance or statement complained of was made was such as constituted the same a conditionally privileged communication, that then it was incumbent upon appellant to establish its specially pleaded defense of privilege, by proving all the elements which go to constitute that defense. And in this connection, it is contended by counsel for appellee that the burden of proof was upon appellant to show, not only that the slander complained of was uttered in the presence and hearing of persons mutually interested in the matter under investigation, and concerning which they had corresponding duties, but that the burden was upon appellant to also prove that the utterance was justified by the occasion; and also that the burden rested upon appellant to prove that the utterance was made in good faith, and in the honest belief of its truth, and also that the burden was upon appellant to prove that there existed just and probable grounds for entertaining such belief. And counsel for appellees contend that this burden was not discharged by appellant, since there was no proof offered by it to show that the statement or utterance to appellee by its manager, Cohen, was justified in any way, and since there was no proof by appellant that the statement or utterance to appellee was made in good faith, and in the honest belief of its truth, and since it was not proved by appellant that there existed any just or probable grounds for holding such belief, if it was held, the defense of privileged communication was not established.

[2] If the occasion on which the slanderous utterance or statement complained of was made to appellee was such as to clothe the same with the qualified privilege contended for by appellant (it is not contended here that the same was absolutely privileged), then, before appellee was entitled to recover

any damages because thereof, it was incumbent upon her to prove that appellant's said manager, Cohen, in making such statements or utterance to appellee, was actuated by actual or express malice, or by other evil motive, and, if there was an absence of such proof, she was not entitled to recover even actual damages. We understand it to be the law of this state that, where the slanderous utterance complained of is shown to be conditionally or qualifiedly privileged, the law itself raises the presumption of good faith and want of malice. It follows, therefore, that before the plaintiff, in a suit of this character, can recover either actual or exemplary damages, where the qualifiedly privileged character of the utterance has been shown, it would be incumbent upon the plaintiff to meet and defeat that defense, by proving by facts and circumstances reasonably sufficient on that point that the utterance was actuated by actual or express malice, or the lack of good faith. Railway Co. v. Richmond, 73 Tex. 568, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794; Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609; Warehouse Co. v. Holloway, 34 Colo. 432, 83 Pac. 131, 3 L. R. A. (N. S.) 696, 114 Am. St. Rep. 171, 7 Ann. Cas. 840; Simmons v. Dickson, 110 Tex. 230, 213 S. W. 612, 218 S. W. 365; McClung v. Pulitzer Publishing Co., 279 Mo. 370, 214 S. W. 193; Odgers on Libel and Slander (5th Ed.) 225.

In Warehouse Co. v. Holloway, supra, we find this language was used by the Supreme Court of Colorado:

"It seems to us that, when the case is shown to have been privileged, the burden of showing that the defendant has lost his privilege is cast upon the plaintiff. The presumption which attaches to a writing, written on a privileged occasion is that it was written in good faith and upon probable cause. As said by Justice O'Brien in Hemmens v. Nelson, 138 N. Y. 524 [20 L. R. A. 440, 34 N. E. 342]: 'The question is not whether the charge is true or false, nor whether the defendant had sufficient cause to believe that the plaintiff sent the letter, or acted hastily, or in a mistake; but the question is, the occasion being privileged, whether there is evidence for the jury that he knew or believed it to be false. The plaintiff [defendant] may have arrived at conclusions without sufficient evidence, but the privilege protects him from liability on that ground until the plaintiff has overcome the presumption of good faith by proof of a malicious purpose to defame her character, under cover of the privilege.'

" 'This kind of malice,' says Justice O'Brien in the case cited, 'which overcomes and destroys the privilege, is, of course, quite distinct from that which the law, in the first instance, imputes with respect to every defamatory charge, irrespective of motive. It has been defined to be an "indirect and wicked motive which induces the defendant to defame the plaintiff." Odgers, Libel and Slander, 267.' "

In Railway Co. v. Richmond, supra, it was said by the Supreme Court of this state:

"We understand the law to be that a communication made in good faith in reference to a matter in which the person communicating has an interest, or in which the public has an interest, is privileged if made to another for the purpose of protecting that interest, and that a communication made in the discharge of a duty and looking to the prevention of wrong towards another or the public is so privileged, when made in good faith. In such cases, although the statements made may have been untrue, malice cannot be implied from the fact of publication, and to sustain an action in which the existence of evil motive must be proved."

In Cranfill v. Hayden, supra, our Supreme Court used this language:

"If a defamatory publication is absolutely privileged, the occasion justifies the language, and no action arises. If the defamatory words are published on an occasion not privileged, and are not justified, malice is implied, for the reason that every act intentionally done to the damage of another, without legal justification, or excuse, is in the eye of the law malicious. But a defamatory publication which is conditionally privileged occupies a middle ground; that is to say, the publication is privileged provided it was actuated by a sense of duty growing out of the occasion, and provided it was not malicious. When the court finds that the publication is conditionally privileged, the effect of the holding is to cast upon the plaintiff the burden of proving that malice prompted the act—not merely malice which arises by implication of law, but malice in fact, otherwise denominated actual malice. In other words, if the publication be conditionally privileged, malice is not implied from the mere fact of publication."

In Simmons v. Dickson, supra, in an opinion of the Commission of Appeals of this state, Section B, approved on this point by the Supreme Court, is was said:

"It is conceded that the publication was conditionally privileged, and that, to be actionable, it must have been published with actual or express malice; the burden of proof being cast upon the plaintiff to establish actual malice. Plaintiff contends, however, and the Court of Civil Appeals held that the jury might infer such malice from the vehemence of the language used and the disproportion between the epithets applied to the plaintiff and the charges made against him. We are unable to concur in this conclusion. It is but the assertion in different language of the proposition that malice can be inferred or presumed from the fact of publication. When a publication is conditionally privileged, the law raises the presumption of good faith and want of malice; and to hold, in such case, that malice may be inferred from the character of the language used alone, would, in our opinion, destroy the force of the privilege. This view, we think, is in accord with the great weight of authority in this country, and with previous holdings of our Supreme Court."

As supporting the holding of the court in that case, Judge McClendon cited Warehouse Co. v. Holloway, supra, Railway Co. v. Rich-

mond, supra, and Cranfill v. Hayden, supra. We think it is clear, from the authorities above cited, that in an action of slander, if it be shown that the slanderous utterance was conditionally privileged, then, before the plaintiff would be entitled to recover, proof must be reasonably sufficient to show that the slanderous utterance was actuated by actual or express malice towards the plaintiff, or by some other evil motive or bad faith.

The next question that follows for determination in this case is whether the slanderous utterance complained of by the appellee on the part of appellant's manager, Cohen, was conditionally or qualifiedly privileged. The undisputed evidence in this case, as reflected by the record before us, bearing upon the question as to whether the occasion which gave rise to the utterance complained of was such as to clothe the same with the privilege claimed for it by appellant, establishes the following facts:

The appellee, a young lady about 16 years of age, was employed by appellant in its dry goods establishment in the city of Houston. Her duties were to wrap and check articles of merchandise sold by appellant in its establishment, either to general customers or to employés themselves in the establishment. There were many employés in the establishment, some of whom waited on purchasers of goods and made sales to them, and others, like the appellee, who wrapped up and checked the articles sold, after the sale had been made. Many of these employés were young ladies called salesladies, one of whom was a young lady named Bessie York. Under the rules and regulations of appellant's establishment, which were promulgated for the conduct of its large business as a mercantile concern, it was required that, when one of the salesladies had made a sale of goods to a purchaser, the articles sold would be sent or carried by the saleslady to one of the wrapping clerks, like the appellee, and at the same time the saleslady making the sale would make out two checks, or lists, one called the original, and the other the duplicate check, or list, each check, or list, showing the items purchased, and also the price thereof, and this would be so whether the articles were to be paid for in cash by the purchaser, or whether the same were to be charged to the purchaser on the books of appellant. These checks, or lists, both original and duplicate, would be delivered to the wrapping clerk, together with the articles of merchandise sold, and it was the duty, if the purchase was made by a stranger to the establishment, or rather any person other than an employé, to check over these lists accompanying the articles sold, and ascertain whether the articles actually delivered to the wrapping clerk corresponded with the articles mentioned in the list, both in kind and price, and also it was the duty of the wrapping clerk to ascertain from the list whether the transaction was a cash transaction or whether the purchase was to be charged. This would be disclosed by notation made by the saleslady on the lists, both original and duplicate. If it was a cash transaction, cash would be paid to the saleslady by the purchaser, and this would also accompany the articles sent to the wrapping clerk, and it was then her duty to wrap up the articles sold for the purchaser, and to wrap within the package the duplicate list, as we have described it, and to then send to the cashier the cash paid therefor, accompanied by the original list or check. If the transaction was not a cash one, that is to say, if the purchase was a credit transaction, both lists, as we have explained, would accompany the articles purchased to the wrapping clerk, and that the purchaser was to be charged on appellant's books therefor, and the duplicate would be wrapped up with the articles purchased, and the package handed by the wrapper to the purchaser, but the original slip, showing the transaction, would be sent by the wrapping clerk to the cashier, just the same as if the sale had been made for cash. If one of the employés, like Miss Bessie York, should desire to purchase any article of merchandise from appellant, the same procedure would be followed with reference to making the original and duplicate lists showing the articles purchased and the price to be paid therefor, and whether the same was paid for in cash by such employé or was to be charged on appellant's books, and the duplicate check, as in the case of a regular purchaser, would be wrapped up with the articles purchased, and the package would be sent to a department in appellant's establishment known as the delivery department, but could not be delivered, under appellant's rules and regulations, at that time to the employé making the purchase, and there would be a red tag on such package sent to the delivery department; but the wrapping clerk handling such purchase was required, under appellant's rules and regulations, to send the original list or check showing such articles and the price thereof, and whether it was a cash transaction or charge account, to appellant's cashier. These rules and regulations were clearly understood by the appellee.

Shortly bfore noon on the 14th day of November, 1918, Miss Bessie York, who, as we have shown, was one of the young lady salesladies in appellant's establishment, carried several articles of merchandise, of the aggregate value of $4.50, to appellee to be wrapped up for her, stating to appellee that she was making the purchase for herself, and that it was a cash transaction, and that she was paying the cash therefor. Appellee took the articles and wrapped them up, and she testified that these articles were accompanied by what purported to be a duplicate list

showing the items purchased and the price charged therefor, and that she inclosed this duplicate list, along with the articles which she wrapped up in the package, and sent the same by one of the little cash boys in the store to the delivery department, which package, under appellant's rules, would have been delivered to Bessie York that evening after the store had closed, or that evening at the closing hour for business. No original check or list was turned over to appellee by Bessie York at the time these articles were brought to her by Bessie York, and she saw no original list or check that had been made by Bessie York, if one was made. Notwithstanding, however, the fact that no original list or check accompanied this purchase, she wrapped up the articles and sent them to the delivery department without having the original list or check to send to appellant's cashier, as appellant's rules required, and in doing this, appellee violated and disobeyed appellant's rules, and was aware of such violation and disobedience at the time of handling this package for Bessie York. Appellee testified, however, that she believed what Bessie York had stated to her about purchasing the articles for herself, and believed that it was a cash transaction by Bessie York, and, as claimed by her, she had no "room or reason" to doubt what Bessie York stated to her. She testified that if Bessie York stole these articles of merchandise, or intended to steal them, she was not aware of such intention, and had no reason to believe or suspect any bad faith or wrong purpose on the part of Bessie York at the time she handled the transaction for her. Shortly after (the time is not definitely stated) this package was sent by appellee to the delivery department, one of the cash boys in the store came to appellee with the package opened, holding the same in his hand, and inquired of appellee for the duplicate list that was supposed to accompany or be in the package at the time it was sent to the delivery department. Appellee replied that she put the duplicate list in the package when she sent it to the delivery department, and that she did not know what had become of such list. Shortly after that, on the same evening, a Mr. Muenster, who occupied the position of floorwalker in appellant's store on the same floor where appellee worked, came to appellee and inquired of her about the duplicate list that was supposed to accompany this package, and appellee explained to him, as she did to the cash boy, that she had put the list in the package, and that she knew nothing more about it. Mr. Muenster went away, but shortly returned to appellee, and told her that Mr. Cohen, appellant's president and general manager, wanted to see her in his private office, and thereupon appellee started, in company with Mr. Muenster, to Mr. Cohen's private office, which was situated on the mezzanine floor above, and when she reached that office, the Bessie York package was lying on Mr. Cohen's office desk, and in the presence of Mr. Muenster and Mr. Kennedy, who was appellant's general superintendent, Mr. Cohen asked appellee, substantially, what she knew about the package, and why the same did not contain the duplicate list that should have been in the package at the time it was sent by her to the delivery department. Appellee stated to Mr. Cohen, then and there that Bessie York had brought the articles of merchandise to her to be wrapped up, and stated to her that she was purchasing them for herself, and that she was paying cash for them, and that Bessie York gave her a duplicate list of the articles showing the items and price, etc., and that she placed the duplicate list in the package when she sent it to the delivery department, and that she did not know what had become of the duplicate list, and did not know what Miss York's purpose was in handling the transaction as she did, and that she did not suspect that Bessie York intended to steal the articles or that she had any criminal intention with reference to them. She stated that she had wrapped the package for Bessie York, and sent it to the delivery department, because Bessie York had asked her to do so, and admitted that she knew that the original list or check should have accompanied the articles when brought to her for wrapping, under the rules and regulations of appellant's establishment, which list would have been sent to the cashier. Whereupon, in the presence of appellant's superintendent, Kennedy, and Mr. Muenster, the floorwalker, Mr. Cohen, appellant's president and general manager, said and stated to appellee: "Well, it behooves you to tell us what you know about this package, because it doesn't look straight," and appellee replied: "Mr. Cohen, I told you all I know about the package." Thereupon Mr. Cohen said to appellee, "Well, it looks like to me that you are as much implicated in this thievery as Bessie York is." Thereupon Mr. Kennedy, superintendent, stated, "Yes, George, I quite agree with you in the fact that she is as much implicated in it as Bessie York." Appellee testified that both Mr. Cohen and Mr. Kennedy spoke in a loud tone of voice in using the language to her just quoted, and that Mr. Cohen seemed to be angry. Mr. Cohen then told appellee to return to her station on the first floor and to not say anything to any one about what had occurred, and thereupon appellee went back to her station and resumed her duties on the first floor.

On the following morning, appellee returned to appellant's store at the usual hour, and appellant's superintendent, Kennedy, told her that she was discharged from further employment by appellant, and she was paid what was then due her, and her connection with appellant's establishment ceased. At the time she was informed by

the superintendent of her discharge, she had gone up as was usual on the second floor where the young salesladies put away their coats, etc., on coming to work, and after she was informed that she was discharged, she went back down on the first floor, and had there stopped and was talking to one of the young salesladies on that floor, and had been there about 10 minutes, so she testified, when appellant's floorwalker, Muenster, approached her, and stated to her, substantially, in the presence of the young lady to whom she was talking, and others, that she was no longer an employé in appellant's store, and requested her to leave the store, and, upon her failing to do so, promptly, Muenster took her by the arm, as she says, for the purpose of ejecting her from the store, and that she was compelled to strike him in order to extricate herself, after which appellee left appellant's establishment.

[3] It was shown by the evidence of appellee herself, as well as others, that appellant's floorwalker, Muenster, was authorized, and that it was his duty, under his employment with appellant, to see that customers were properly waited on in appellant's store, and to see that all employés on the floor discharged their duties and observed and obeyed the rules and regulations of appellant in the conduct of its business, and further, that it was his duty to investigate and correct any breach or violation of such rules and regulations by the employés on that floor. It was also shown, without dispute, that appellant's superintendent, Kennedy, was authorized, and that it was his duty, to employ and discharge the employés in appellant's establishment, including the appellee, and to generally superintend the business of the store. It was also shown without dispute that George Cohen was the president and general manager of the Foley Brothers Dry Goods Company, and had supreme direction and control of all other employés in appellant's establishment. In short, it was shown by the undisputed testimony that appellant's floorwalker, Muenster, its superintendent, Kennedy, and its president and general manager, Cohen, were all authorized, and it was their duty, to enforce the rules and regulations of appellant governing the conduct of its mercantile business, and to investigate any irregularities by employés under them, and to prevent any and all disobedience and violations of such rules and regulations by such employés. This duty each of these men owed to the Foley Brothers Dry Goods Company, and the proof shows, without dispute, we think, that each of these men was in the discharge of his duty at the time the slanderous utterance or statement complained of by appellee was made. The proof shows, without dispute, that there were many employés in appellant's establishment, some of the testimony indicating that the aggregate number

231 S.W.—30

of employés would exceed, perhaps, 250. It is manifest that it was necessary for the conduct of such a large establishment that rules and regulations should be promulgated and enforced; and we hold, as a matter of law, upon the facts of this record, that appellant's manager, Cohen, in making the utterance or statement complained of, and sought to be made the basis of this suit, did so in the discharge of his duty to appellant, and that, therefore, such utterance to appellee was qualifiedly privileged, and the trial court should have so held as a matter of law. It was clearly announced in the case of Railway Co. v. Richmond, supra, and also in Cranfill v. Hayden, supra, that any utterance or communication made by one to another in the discharge of a duty owed by the one making the utterance is qualifiedly privileged, and cannot be made the basis of an action for damages, either actual or exemplary, unless it be shown by the party complaining of the utterance or communication that the same was actuated by actual or express malice or want of good faith. The holding in those cases was expressly approved and adhered to in Simmons v. Dickson, 110 Tex. 230, 213 S. W. 612, 218 S. W. 365. See, also, Railway Co. v. Floore, 42 S. W. 607, in which writ of error was denied by the Supreme Court of this state. In that case the court used this language:

All such matters commonly "charged to be libelous, clearly showing that it was a business matter in which the railway company was interested, and such communication appearing to have been sent only to persons concerned in the matter, the court should have charged the jury that the communication was privileged, and that a recovery could not be had without proof that the privilege was exercised in malice. * * *"

And in the Richmond Case, supra, it was said by our Supreme Court:

"We understand the law to be that a communication made in good faith in reference to a matter in which the person communicating has an interest, or in which the public has an interest, is privileged if made to another for the purpose of protecting that interest, and that a communication made in the discharge of a duty and looking to the prevention of wrong towards another or the public is so privileged when made in good faith. In such cases, although, the statements made may have been untrue, malice cannot be implied from the fact of publication, and to sustain an action in which the existence of evil motive must be proved."

As sustaining its view on the point, the court quoted from Harrison v. Burk, 5 El. & Bl. 348, as follows:

"A communication made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty,

although it contained criminatory matter which without this privilege, would be slanderous and actionable. * * * 'Duty,' in the preferred canon, cannot be confined to legal duties which may be enforced by indictment, action, or mandamus, but must include moral and social duties of imperfect obligation."

"When words imputing misconduct to another are spoken by one having a duty to perform, and the words are spoken in good faith and in the belief that it comes within the discharge of that duty, or where they are spoken in good faith to those who have an interest in the communication and a right to know and act upon the facts stated, no presumption of malice arises from the speaking of the words, and therefore no action can be maintained in such cases without proof of express malice. If the occasion is used merely as a means of enabling the party to utter the slander to indulge his malice, and not in good faith to perform a duty or make a communication useful and beneficial to others, the occasion will furnish no excuse."

We repeat that the occasion on which the utterance complained of by appellee was made to her was, upon the undisputed facts of this case, such as to give the utterance a qualifiedly privileged character, because the utterance complained of was by one who had a duty to perform to another, and therefore, under the authorities, the utterance was qualifiedly privileged.

[4] But the able counsel for appellee in this case contend that, if this court should conclude that the utterance complained of was qualifiedly privileged, nevertheless, such utterance being slanderous per se, the burden of proof rested upon appellant to show want of malice, and that the utterance was made in good faith, and in the belief of its truth. We have already shown, by the authorities above cited, that this contention cannot be sustained, but, on the contrary, such authorities clearly hold that, where the utterance is shown to have been conditionally privileged, the plaintiff must then take the burden of showing that the same was actuated by actual or express malice or want of good faith.

[5] This brings us to the question as to whether there was sufficient evidence in this case to warrant the jury's finding that the utterance complained of was actuated by actual or express malice, or want of good faith. Appellee contends that the evidence was sufficient to warrant such finding by the jury. We cannot, without making this opinion too long, go into the evidence in detail, but we shall state, substantially, all, facts and circumstances which we think could reasonably have any bearing upon the point. The evidence is undisputed that this young lady, the appellee, at the time of the occurrence complained of, had been in appellant's employ about a month, in the discharge of the same duties as she was performing at the time of the occurrence. She testified that she knew appellant's floorwalker, Muenster, and the superintendent, Kennedy, and its president and manager, George Cohen, and that she saw these gentlemen on an average of once or twice a day during her employment; that up to the time of the occurrence complained of she had never observed anything in the conduct of either of these gentlemen towards her to indicate any unkind or disrespectful feeling for her; that up to the time of the occurrence, no disobedience or irregularity on her part had been called to her attention or complained of by either of the gentlemen mentioned, and the substance of her testimony, in short, is that she knew of no reason why either of these gentlemen should entertain any unkind or unfriendly feeling for her. She further testified that Miss Bessie York, on the very evening that the conduct which appellant was investigating occurred, was discharged, and that such discharge was because appellant's manager believed that Bessie York was guilty of the theft of the articles of merchandise concerning which the investigation was instituted, or that she intended to steal the same, and there was not a fact or circumstance, as we view this record, offered by the appellee showing or tending to show that appellant or any of its employés in authority entertained any unkind feeling for Bessie York, or that her discharge was because of anything other than the belief on the part of appellant's manager of her guilt relative to the said articles of merchandise. It is true that appellee testified that the words uttered and spoken to her by appellant's manager, Cohen, and of which she complains, were uttered in a loud and angry tone, and, if this be true, it is also true, perhaps, that it was not absolutely necessary that the utterance should have been made in such tone, nor that the language used should have been so strong. It was clearly held, however, in Simmons v. Dickson, supra, substantially, that, when the utterance complained of is conditionally privileged, the law raises the presumption of good faith and want of malice, and that it cannot be held in such a case that malice may be inferred from the character of the language used alone, because such an inference would have the effect to destroy the defense of privilege. The court used this language:

"Plaintiff contends, however, and the Court of Civil Appeals held, that the jury might infer such malice from the vehemence of the language used and the disproportion between the epithets applied to plaintiff and the charges made against him. We are unable to concur in this conclusion. It is but the assertion, in different language, of the proposition that malice can be inferred or presumed from the fact of publication. When a publication is conditionally privileged, the law raises the presumption of good faith and want of malice; and

to hold, in such a case, that malice can be inferred from the character of the language used alone, would, in our opinion, destroy the force of the privilege."

So it is contended here by counsel for appellee, among other things, that the mere disobedience of rules by the appellee, or the irregularity of which she was guilty in handling the package of articles delivered to her by Bessie York, would not require such strong language or epithet as was applied to her by appellant's manager for such disobedience, and that therefore that fact may be considered by a jury as strongly indicating actual malice and want of good faith on the part of appellant's manager. If we concede the contention, we would, in effect, hold contrary to the law as just quoted. It is further contended by counsel for appellee, in effect, that the jury might have reasonably inferred malice on the part of appellant's manager and those engaged with him in the investigation, because, at the time of the utterance complained of, appellee had explained and declared to all three of the gentlemen engaged in the investigation that she knew nothing about the motive that prompted Bessie York in bringing the articles to her as she did, and that she had no "room or reason" to suspect Bessie York of any wrong intention, and that, since there was no evidence that appellant made any further investigation to see what actuated Bessie York in thus handling the articles, the jury was authorized to infer malice or bad faith; but in this connection we repeat that appellee herself expressly testified that Bessie York was discharged by appellant because its manager believed that she was guilty of the theft of the articles, or that she intended to steal them. Appellee also contends that the action of appellant's floorwalker, Muenster, on the next morning, when appellee was discharged, in speaking to her as he did, and attempting to remove her from the store, was a cogent fact and circumstance showing malice and bad faith on the part of appellant towards her, but it must be remembered that, at the time of this conduct on the part of Muenster, the utterance complained of had already occurred, and we feel sure that we would not be justified in concluding that the conduct of Muenster in this regard should be construed as proof of actual malice attributable to appellant in making the utterance complained of by its manager, Cohen.

It is true, as contended by counsel for appellee, that the record, as made by appellee's testimony, shows without contradiction by any witness that she was not guilty of any criminal intention or purpose in handling the Bessie York package as she did, and that therefore the charge that she was guilty of theft of the package, or as much so as Bessie York, was false, but it has been too often held by the appellate courts of this state that, where a finding of actual malice is necessary to sustain a recovery for a slanderous utterance which is conditionally privileged, malice cannot be found from the falsity of such statement alone. Laughlin v. Schnitzer, 106 S. W. 908, and authorities there cited. In the case cited it was said:

"It was necessary in order for plaintiff to recover, that the jury should find that the words were spoken with some degree of express malice, but this fact they could not find from their falsity alone. Bradstreet v. Gill, 72 Texas, 121, 9 S. W. 753, 2 L. R. A. 405, 13 Am. St. Rep. 768."

Taking the record before us in its entirety, we have reached the conclusion, giving consideration to every fact and circumstance that could reasonably be said to show malice or lack of good faith on the part of appellant's employés, whose conduct is complained of by appellee, that such evidence as a whole was insufficient to warrant the finding of the jury that appellant was actuated by actual malice in making the utterance to appellee of which she complains, and we are therefore constrained to hold that the finding of the jury that there was such actual malice has no reasonable support in the evidence, and that the sixth and seventh assignments, which, in effect, make complaint of that finding, must be sustained.

We will not say, however, that, upon the record as a whole, there is no fact or circumstance that might have a tendency to prove malice, but only hold that the evidence, as developed and shown by the present record, was not sufficient to warrant a finding by the jury that there was such actual malice. It may be that we would be justified in holding that the evidence on that point is so weak as to require the judgment to be reversed and rendered. But it appears to us that the case was tried by appellee upon the theory that the burden was upon appellant to disprove malice on its part, and it may be that other evidence can be produced by the appellee upon another trial sufficient to show that the slanderous utterance made the basis of this action was actuated by malice, and, if so, appellee would be entitled to recover in some amount. We therefore overrule the fourth and fifth assignments, which complain, in effect, of the refusal of the trial court to peremptorily instruct a verdict in appellant's favor.

What we have said above, in effect, disposes of all other assignments in appellant's brief, and it is unnecessary to notice them further.

Being of the opinion that the slanderous matter complained of was qualifiedly privileged, and that therefore the burden of proof was upon appellee on the issue of malice and

want of good faith, and that the finding of the jury that there was actual malice is not reasonably supported by the evidence in the record before us, it follows that the judgment should be reversed, and the cause remanded, and it will be so ordered.

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes