## WORLD OIL CO., Inc., v. HICKS.
### No. 4085.

Court of Civil Appeals of Texas. Texarkana. Feb. 5, 1932.

Rehearing Denied Feb. 11, 1932.

Samuels, Foster, Brown & McGee and Dean & Perkins, all of Fort Worth, for appellant.

Clay Cooke, W. D. Nicholson, and Mack Taylor, all of Fort Worth, for appellee.

SELLERS, J.

This suit was brought by appellee, L. R. Hicks, Jr., for damages for libel against appellant, World Oil Company, and also against Chester R. Bunker, E. Harriette Bunker, and W. L. Moseley, who are directors of the World Oil Company. Upon a trial before a jury a judgment was rendered in favor of appellee for the sum of $7,500 jointly and severally against the appellant World Oil Company and the defendant Chester R. Bunker, judgment being in favor of the other defendants. From this judgment the appellant World Oil Company has duly prosecuted this appeal, and the disposition made of this appeal will not disturb the judgment against the defendant Chester R. Bunker who did not appeal.

The suit grew out of the writing of a letter by the directors of the World Oil Company to the stockholders of the company. The letter is some fifty pages long, and because of this fact, we will not undertake to copy the letter in full, but we will quote at length from the letter rather than undertake in our own way to give the substance of it.

"World Oil Company
"Oil Production
"World Building
"Fort Worth, Texas.
"Chester R. Bunker
"President
"H. E. Granville
"Vice-President
"W. L. Moseley
"Treasurer
"C. R. Lewis
"Secretary.

"July 24, 1928.
"To Stockholders, World Oil Company,
"My Dear Stockholder:

"We of the World Oil Company are face to face with an immediate crisis. *We are confronted by a problem that will play havoc with our company unless it is promptly handled!*

"I never thought I would have to come to you with this bad news. I have been trying to spare you the worry of it because I thought I could handle it myself. Now, however, after employing all my ingenuity and ef-

forts toward handling it, I find conditions are such that I must come to you for aid in coping with this problem and must have the immediate assistance of every World Oil Company stockholder to save our company from ruin. While this may sound very bad to you, yet there is no occasion for you to become shocked or unduly frightened until I acquaint you with the detailed circumstances. * * *

"Several months ago, 'a broker' by name of L. R. Hicks, Jr., brought suit against the World Oil Company, claiming that he was due commissions from the sale of stock in our company. He claimed that he had a contract to sell stock for the World Oil Company and was to receive a commission for the sale of this stock. *This suit was absolutely without foundation,* as our books show very plainly that this man Hicks never at any time made any sales of stock for the World Oil Company or no other broker for that matter. * * *

"I knew Hicks was boosting World Oil in his market letters, but so were other brokers, as it was the leading issue in oil at that time. I could see no harm in this boosting, as what the brokers were saying favorably about World Oil was true. This man Hicks had rented an office in the World Building, which building the World Oil Company had under lease and as the company did not require all of the building for its use, a portion of the third floor was rented to outsiders, one of which was Hicks. It was not long after Hicks started in the brokerage business that he got into financial difficulties, as most brokers do sooner or later, and could not pay the rent of his office in the building which the World Oil Company had under lease. After several months' rent were past due, our treasurer told Mr. Hicks that he would have to pay up his rent or get out. Hicks lost his temper and attacked Mr. Moseley, and a short encounter ensued. The fight soon terminated, however, with neither of the contestants getting much the worse of it, except Hicks, who had a slight abrasion on the side of his face. But Hicks did not make any move to pay his rent to World Oil Company, so he was ordered out of the building and his furniture held for his past due rent. After he was rejected from the building he started *slandering* and *harrassing* the World Oil Company in every way he could.

"Finally, he got together with a couple of Fort Worth lawyers and a suit was started against the World Oil Company, claiming $60,000.00 due Hicks on commissions for the sale of stock and this in the face of the fact that Mr. Hicks had never sold for this company *one single share of stock*. Mr. Hicks executed a document to his lawyers to the effect that he would give them one-half of whatever he got out of the World Oil Company as a fee for their services. This instru-

ment is recorded in this county and shows to what lengths he went against the Company.

"When the suit was filed against us, our attorneys looked over the case and laughed at the impertinence and audacity of Mr. Hicks, realizing, of course, that Hicks had no case against the World Oil Company, and it appeared to them that it was all part of a scheme to hurt the prestige of the company and beat down the market value of World Oil Company stock. The case finally came to trial in the District Court of Fort Worth, and our attorneys advised us to go ahead with the trial, as Hicks had no cause of action, which was evidenced to them for the reason that Hicks' attorneys had tried on several occasions prior to the trial to compromise the matter for a very small amount in comparison with the sum sued for. In fact, Hicks' lawyers tried to compromise the case only a few days before trial, but our attorneys refused any compromise, saying that Hicks had no case and that it would be no trouble for the World Oil Company to win in court.

"We, of course, felt the same way about it, knowing in our hearts that we had made no contract with any broker and that Hicks certainly did not have a contract to sell World Oil Company stock on a commission basis. When Hicks got on the stand under oath, he could not produce a contract. He didn't have a scrap of paper or writing from the World Oil Company to base his suit on. He simply *claimed* he had a verbal contract, but had no witnesses to this verbal contract. We, ourselves, knowing full well that he had had no verbal contract with any official of the World Oil Company, and if he had, it would not be binding on the company for the reason that the Board of Directors would have to approve such a contract and it would most assuredly have to be in writing. I was not worried; neither were our attorneys. In our opinion and from the looks of the case, we figured we would win hands down. You can, however, imagine our dismay when the jury came out and *rendered a verdict in favor of* Hicks and a judgment against the World Oil Company, in the amount of $45,000. It is a matter of fact, however, that you cannot tell what a jury will do, because it would seem that in lots of cases they do not go by the evidence, but listen to the lawyers' fantastic pleadings and of course Hicks' lawyer stated to the jury that this big oil company should be made to pay this little man what it owed him, and generally tried to make the jury believe that this big corporation should be stuck for whatever this poor hard-working small broker thought the company owed him. * * *

"We didn't have a chance! We were trapped with our hands tied and, as the motion for a new trial was overruled by the Judge, our attorneys told us we would have to make

a bond for *double the amount* of the *judgment* and appeal it to the Court of Appeals, our lawyers saying that it would most certainly be reversed and that it was their firm opinion that a decision would be rendered in our favor by the higher courts, for Hicks had not made out a case and the verdict he received was not in accordance with the evidence brought out during the trial. I had not begun to worry, because I believed that I personally could make this appeal bond for the company and I straightway began to try to do this. I have tried every way humanly possible to make this bond. I have sweated over it. I have studied the situation in every way possible, but it is impossible for me to make it personally, because I have my funds all tied up in the company, because of my faith in the company, and it is necessary to put up security as collateral for this bond before the District Court will allow us to appeal our case to the higher courts.

"Also, this security must be put up as collateral for us to lift the liens now on our properties in Texas by reason of this judgment and enable the company to carry on its operations and have clear title to its properties. The bond required is approximately $91,000.00. I have tried in every way I know to raise it personally, but, as above stated, I have almost everything I own tied up in the World Oil Company and World Exploration Company, just like my stockholders, because I believe in these companies and know that with full cooperation they are going to be successful. * * *

"We must raise this bond by *Wednesday, August 1st*, and have it up with the District Clerk by that time. I personally cannot do it. I have tried every way possible and have used every ingenuity at my command, without avail. Now, I am asking *you* and *all other stockholders* to *lend your company the money to make this bond*. By putting up the cash we will only have to make bond for the actual amount of the judgment, plus the costs, or $50,000. *I am asking you to send me $10.00.* I have figured it out on a pro rata basis for the stockholders and this is the least figure that will do it. I want you to get that money here to me *not one minute later than Wednesday, August 1st, because that is the deadline.* * * *

"I had hoped to get this matter cleared up and make this bond myself, because I believe in the company and love every man and woman who has placed money in the company and I realize the responsibility that is on my shoulders by reason of this investment. Yet, I am human and can only do so much after all. Then I must call on my associates who I am proud to say have never failed to heed my call. I have been fighting brokers and bucket shops right and left in an endeavor to save my stockholders who have business

transactions with these bucket shops, their hard-earned money. I am not getting anything for making this fight, but I would not feel that I was doing my duty unless I put information before my stockholders that would save them from loss. Therefore, I am giving them information as I see it right here in the stronghold of bucket shops, because I know that they are parasites and thieves and they put out propaganda and lying instruments about companies that have no vestige of truth in them but are put in the market sheets for the one reason of frightening the stockholders so that these bucket shops can obtain stock to fill their shorts.

"These so-called brokers and bucket shops are operating in *open violation of the law*. They are selling stock that they haven't got and when the accounts are paid up they are faking to make delivery right and left and as they are not very strong financially, the client is going to be left holding the sack in lots of cases, is going to suffer complete loss of his entire investment made with these bucket shops. The things that these brokers have said about the companies that I am endeavoring to head have hurt us. The lies that they have been putting out on us have been detrimental to our best interest and they have succeeded in some cases in frightening some of my stockholders into selling their stock at a ridiculous price, but I am glad to say that the great majority of the World Oil Company and World Exploration Company stockholders are standing pat and are seeking their information from company headquarters are not believing the lies that are being put out by these parasites that are masquerading under the name of brokers.

"With reference to the loan that I am asking you to make the company, I have figured out as best I can the least possible amount that each stockholder must of necessity lend his company to make this bond, and that amount is the sum of $10.00. In other words, I want you to send me *by wire* or *mail, instantly*, upon receipt of this letter, the sum of $10.00, which I will place in the bank to be applied on our bond. I believe I will get this thing cleared up by August 1st, because my faith in the stockholders of this company will not allow me to believe anything else. * * *

"In the meantime, the World Oil Company will issue its note and this note will be secured by company assets in just as strong a way as your officers, with the advice of the best legal talent, can possibly secure it. * * *

"Remember now, I ask you to lend the World Oil Company $10.00 for which you will receive a secured note evidencing this loan just as quick as the mail can bring it back to you. This money to be paid back to you just as soon as our case is settled in our favor. I am asking that you make any sacrifice within your power to get this money to me *by August 1st*. Do what you can. Do the impossible, if you can, but do not fail to stand by your company. If you can't get it into the mails in time to be in the company's office by August 1st, *wire the money* to the company.

"Awaiting your assistance with a prayer in my heart for your understanding and immediate response.

"Always faithfully yours,
"[Signed] Chester R. Bunker, President.
"World Oil Company.
"P. S. Either mail or send the money by wire to me personally or to the World Oil Company, Fort Worth, Texas, to reach here not later than August 1st.
"C. R. B."

The appellee alleged that the letter was written with malice and intended and did call him a parasite and thief, and, further, that he operated a bucket shop in violation of law, all of which was untrue, and that he was damaged thereby.

Appellant answered by a general demurrer and a number of special exceptions, and denied generally the allegations in appellee's petition, and further alleged that the letter was written only to the stockholders of the appellant and that it was therefore qualifiedly privileged.

Appellant has many assignments of error in its brief, all of which have been duly considered and are overruled except those which have otherwise been hereinafter disposed of.

It is undisputed in the record that the letter involved was sent only to the stockholders of the appellant. That said letter was composed or ordered to be written by a majority of the directors, and was signed by Chester R. Bunker as president of World Oil Company, appellant herein. Neither can it be disputed that the subject-matter about which the letter was written was the raising of money to make a supersedeas bond in a case where the appellee had recovered a judgment against appellant for a sum in excess of $45,000. Certainly the letter was about a matter which was of most vital interest to those writing the letter as well as those receiving the same. Such a letter is believed to be under the authorities of this state a qualified privileged one. Simmons v. Dickson, 110 Tex. 230, 213 S. W. 612, 218 S. W. 365; International & G. N. Ry. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 181.

When a recovery for libel is sought upon a publication which is qualifiedly privileged, the burden is upon the plaintiff to prove that the publication when written was prompted by actual malice toward the one about whom the libelous language is used. Simmons v. Dickson, supra; Nunn v. Webster

(Tex. Com. App.) 260 S. W. 157; Foley Bros. Dry Goods Co. v. McClain et al. (Tex. Civ. App.) 231 S. W. 459.

Actual malice which will suffice in such cases has been recently defined by the Commission of Appeals of this state in the case of Lattimore v. Tyler Commercial College, 24 S.W.(2d) 361, 363, as follows: "Ill-will, bad or evil motive, or such gross indifference to the right of others as will amount to a willful or wanton act."

Conceding, then, as we do, that it cannot be said that there is no evidence upon which a finding by the jury of actual malice could be supported, we come to the serious question on this appeal, and that is: Has the issue of actual malice been submitted to the jury by the court? The court charged the jury as follows:

"Special Issue No. 2. Malice, as that term is used in this charge, means a wrongful act intentionally done for the purpose of injuring a particular person.

"In this connection you are charged that malice in this case cannot be inferred alone from the fact that the letter in question was written and mailed to stockholders of the World Oil Company.

"Question: Bearing in mind the foregoing definition of malice, Was the language complained of in the letter actuated by malice on the part of the defendant, Chester R. Bunker? Answer Yes or No. Answer 'Yes.'"

The definition as given of malice by the court in its charge is far short of the definition given by the Commission of Appeals of this state, above set out, deemed necessary in cases of libel. In fact, the definition given by the court is the uniform definition of malice in law, and is entirely insufficient in cases of this kind. Words and Phrases, First, Second and Third Series.

Therefore, we have concluded that the court's charge did not submit to the jury, in connection with special issue No. 2, the definition of "actual malice" which was necessary for the jury to intelligently understand and answer the issue of malice as submitted.

The appellee makes the point that the appellant having only excepted to the charge for its failure to define actual malice and not having requested a correct charge, he has waived his right to complain on this appeal. With this contention we do not concur. The charge as given by the court wholly failed to define actual malice. In such cases where a necessary definition is wholly omitted from the charge, an exception to the charge for the failure of the court to give the required definition is sufficient. Hutson v. Bassett (Tex. Civ. App.) 35 S.W.(2d) 231; Butler v. Herring (Tex. Civ. App.) 34 S.W.(2d) 307.

The judgment of the trial court is reversed, and the cause remanded.

WILLSON, C. J.

I think the definition of the word "malice" in the trial court's charge to the jury was not as full as it should have been, but do not think it was affirmatively erroneous. As I understand the rule applicable, the appellant (not having requested it) is not entitled to complain here because the word was not further defined.