STEVENSON, ET AL. *v.* BALTIMORE BASEBALL CLUB, INC., ET AL.

[No. 291, September Term, 1967.]

*Decided July 3, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Robert V. Lazzaro* and *Andrew Jackson Graham* for appellants.

*Russell R. Reno, Jr.,* and *Francis D. Murnaghan, Jr.,* for appellees.

SINGLEY, J., delivered the opinion of the Court.

Stevenson and his three fellow appellants were plaintiffs below in substantially similar slander suits, consolidated for purposes of trial, brought against Baltimore Baseball Club, Inc., the owner of the Baltimore Orioles and William Roberts, ticket manager of the Orioles. Each of the plaintiffs sought $250,000 in compensatory damages and $250,000 in punitive damages. At the conclusion of the plaintiffs' case, the trial court granted the defendants' motion for a directed verdict. This appeal followed.

Stevenson and his colleagues had been employed by the Orioles as part time "runners," whose principal duties were to see that ticket sellers at the Baltimore Stadium were kept adequately supplied with tickets and change. On occasion, they might act as "checkers," who counted the tickets as they were delivered to the runners. Roberts, called as a witness by the plaintiffs, testified that when he was appointed ticket manager in 1963, "* * * ['T]here had been some [ticket] shortages in '63 and when I took over, it was emphasized that I was taking over the department and that I should be aware of the situation and make sure that I would try to run it as a tight department so there wouldn't be an occurrence of shortages."

At the third game of the 1964 season, played with the New York Yankees on 19 April, 34 tickets were unaccounted for. Prior to the next game, a twi-night doubleheader to be played with Boston on 23 April, Roberts determined to put a new control into effect which would involve counting in the vault, where the tickets were kept, any additional tickets needed by

the ticket sellers before such tickets were issued to the runners, who customarily counted them (or had them counted by a checker), entered them on the ticket sellers' reports and delivered them to the ticket sellers, who gave a receipt for them. When ticket sales for the 23 April game were reconciled, a discrepancy was discovered: eight reserved seat tickets issued from the vault had not been entered on the report of the ticket seller to whom they should have been delivered.

Following this discovery, Roberts asked Al Philburn, the supervisor of the Orioles' part-time employees, to call the appellant Stevenson and the four runners who worked on the evening of 23 April (the three appellants other than Stevenson, and a fourth man who is not a party to this case) to a meeting to be held at the Orioles' board room on 30 April. Present at the meeting were the five part-time employees together with Roberts, Philburn, and Joseph Hamper, who was Roberts' supervisor. Stevenson's declaration sets forth what happened at the meeting. Roberts first made a statement:

> "Fellows, I am going to make this short and sweet, I feel as though I cannot trust you any longer, turn your badges over to Mr. Philburn."

The declaration continues:

> "* * * [T]his announcement was followed by a period of silence after which time one of the persons present asked for an explanation to which * * * Roberts replied 'We noticed a discrepancy in Sunday's Game with the New York Yankees * * *, We set a plan for Thursday's game * * * and the bait was taken by one of you and the game tickets were missing.' 'After what happened, I feel as though I cannot trust any of you and can no longer feel at ease sitting behind my desk knowing that you five men * * * are handling my tickets in the other room.' * * * Roberts was then queried, 'Bill, are you saying that Frank * * *, Nino * * *, Larry * * *, Willie and myself... [the four runners and Stevenson] are dishonest?' To which * * * Roberts replied, (nodding his head af-

firmatively) 'If you want to put it that way, yes.' \* \* \*
Roberts, was then asked, 'If you baited someone, then
you know who got the tickets?' His reply was, 'I can't
say, all I know is the innocent must suffer with the
guilty and if the guilty party wants to confess then I
might take the other men back.' \* \* \* Roberts was
then told, 'If you know who it is then why didn't you
just fire that person instead of firing all of us.' \* \* \*
Roberts then replied, 'The innocent must suffer with
the guilty, I feel sorry for the innocent but there is
nothing I can do, I cannot sit in my office knowing you
five men are in the office and knowing that I can't
trust you, I don't want anyone near me I cannot trust.'"

At the trial, there was no substantial variance between the testimony and the allegations although two of the witnesses said that Roberts said "A trap was set for the Boston series" and that the question asked of Roberts was, "Are you saying that Nino, Larry, Frank, Willie and myself are thieves?"

The appellants, while conceding that a qualified privilege existed because of the employer-employee relationship, contend that the words spoken by Roberts are slanderous, and that the trial court erred in ruling as a matter of law that there was no evidence from which the jury could find actual or express malice.

The appellees' motion for a directed verdict rested on four contentions, which were renewed in the argument of the case before us:

1. That the alleged slanderous words came within the qualified privilege which permits an employer to tell his employees the reasons why one or more of their number are being discharged.

2. That, where an alleged slander is against an unspecified member of a group, no action will lie.

3. That, if the court were to find that the alleged slander was directed against all five of the men discharged, then no action will lie because there was no publication of the slander.

4. That the words complained of were not slanderous per se, and, in the absence of proof of special damages, no action will lie.

Under our view of the case, the first contention is controlling, and we neither reach, nor pass upon the other three.

It has long been recognized that certain communications may enjoy a qualified or conditional privilege. As Baron Parke said, in *Toogood v. Spyring,* 1 C. M. & R. 181, 193, 149 Eng. Rep. 1044 (1834), where suit for alleged defamation was brought by a journeyman carpenter against a tenant of the Earl of Devon, who had employed the carpenter:

> "In general, an action lies for the malicious publication of statements which are false in fact, and injurious to the character of another (within the well-known limits as to verbal slander), and the law considers such publication as malicious, unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned. In such cases, the occasion prevents the inference of malice, which the law draws from unauthorized communications, and affords a qualified defence depending upon the absence of actual malice. If *fairly* warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society; and the law has not restricted the right to make them within any narrow limits."

The various types of qualified or conditional privilege are categorized in Prosser, *Torts* (3d Ed. 1964) at 805 ff. and in *Restatement, Torts* §§ 593-612 (1938). Communications arising out of the employer-employee relationship clearly enjoy a qualified privilege, and could be included in the line of cases which extend the privilege to groups engaged in a common purpose, Prosser, *Torts,* at 809; *Restatement, Torts* § 596, or may more simply be regarded as sui generis, relying on *Toogood v. Spyring, supra.* Bower, *Actionable Defamation* (2d Ed. 1923) at 116, takes the latter view. *See also,* Evans, *Legal Immunity for Defamation,* 24 Minn. L. Rev. 607 (1940).

The privilege may be lost, however, if the plaintiff in a defamation case can show malice, which in this context means not

hatred or spite but rather a reckless disregard of truth, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will. A distinction can be drawn also between statements which are volunteered, where the speaker's motive will be more carefully scrutinized, *Restatement, Torts* § 595(2)(a) and information elicited from the speaker in response to an inquiry, where greater latitude is permitted. *Fresh v. Cutter,* 73 Md. 87, 92, 20 A. 774 (1890).

In the case before us, we cannot agree with the appellants' contention that there was sufficient evidence of malice to take the case to the jury. Roberts' statement to the five men was temperate and supported by the facts. It is true that the new control which he had imposed, *i.e.,* the independent count of additional tickets before they left the vault, only established that the tickets had been taken by one of the group, and was not susceptible of fixing responsibility on any one of the men with absolute certainty. The testimony shows, however, that Roberts told the group that any one of them could submit a resignation, or alternatively, could regard themselves as having been discharged for inefficiency; that Mr. Hamper suggested that the termination of employment could be explained as a result of a change of policy within the ball club; and that the president of the Orioles, at a later date, wrote a letter of recommendation for one of the runners. None of this seems consistent with the idea that the discharges were motivated by ill-will.

The typical defamation action arising out of the employer-employee relationship involves a communication made *about* the plaintiff rather than *to* him. *Toogood v. Spyring, supra.* In *Fresh v. Cutter, supra,* Fresh, a former employer of Cutter, learned that Cutter was about to enter the employ of Allen. Without solicitation or inquiry from Allen, Fresh said to Allen: "[Cutter] stole as good as $200 from me and I want the money." Judge (later Chief Judge) McSherry, speaking for the Court, reviewed the authorities, and concluded:

"It follows from these principles that if the communication made to Allen was made in good faith, without

malice, in the honest belief of its truth, and under the conviction that it was a duty which Fresh owed to Allen to make it; the words complained of would not be actionable, because privileged, though spoken voluntarily. It is equally clear that if the words spoken were known to be false and were maliciously spoken; or were voluntarily spoken to one to whom Fresh owed no duty in the sense heretofore mentioned, the words would be actionable, because not within the privilege." 73 Md. at 94.

*Jump v. Barnes,* 139 Md. 101, 114 A. 734 (1921), which is relied on by the appellants, is distinguishable since there was clear evidence of actual malice. *See also, Henthorn v. Western Md. R. R. Co.,* 226 Md. 499, 174 A. 2d 175 (1961); *Simon v. Robinson,* 221 Md. 200, 154 A. 2d 911 (1959); *Bavington v. Robinson,* 127 Md. 46, 53, 95 A. 1067 (1915); *Maurice v. Worden,* 54 Md. 233 (1880); *Garrett v. Dickerson,* 19 Md. 418 (1863).

As we see it, the case before us falls squarely within the rule of *Beeler v. Jackson,* 64 Md. 589, 2 A. 916 (1886). In that case, Beeler, the general agent in charge of the Baltimore and Ohio Railroad terminal at Locust Point, had been plagued with petty pilferage from freight cars. Beeler employed a private detective who conducted an investigation which resulted in the discharge of five employees, of whom Jackson was one. When Jackson asked for the reason for his discharge, Beeler replied:

> "You are discharged for stealing fish, nuts and breaking off car doors and taking them home." "You have been seen eating nuts and herrings." 64 Md. at 592.

There were five other men present who had been discharged at the same time, and when another asked the same question, Beeler said "You are all discharged under one charge." *Ibid.*

Beeler made these statements in the presence of his clerk, and within hearing of other clerks in the next office. Jackson sued Beeler for slander. Judge Bryan, speaking for the Court, holding that the question of malice ought not have been left to the jury, said:

> "It was very natural that [Jackson] should wish to

know why he was discharged; and it was but simple justice that [Beeler] should truthfully and frankly tell him the reason. It was in the nature of a social duty that he should do so. It was a proper and legitimate occasion to speak freely and without reserve. In order to relieve him from all embarrassment, the law shields him from any injurious consequences on account of his answer; provided it is given in truth, honesty and fairness. Within these limits, it is a privileged communication. If however, he uses the occasion as an opportunity to wreak his ill-will upon the questioner, to abuse and vilify him, and to injure him in the estimation of his neighbors, he will be held to a just responsibility. He must answer the question, simply as a mode of giving to the questioner the information which he ought justly and rightfully to have. When the words alleged to be slanderous, are embraced in the class of privileged communications, it is shown by a great number of authorities that the plaintiff is bound to prove the existence of malice as the real motive of the defendant's language. But it is not necessary to prove that there was personal spite or ill-will towards the plaintiff." 64 Md. at 593.

See also, *Montgomery Ward & Co. v. Watson,* 55 F. 2d 184 (4th Cir. 1932); *Killebrew v. Jackson City Lines,* 225 Miss. 84, 82 S. 2d 648 (1955); *Hall v. Rice,* 117 Neb. 813, 223 N. W. 4 (1929); *Southern Ice Co. v. Black,* 136 Tenn. 391, 189 S. W. 861 (1916); *Foley Bros. Dry Goods Co. v. McClain,* 231 S. W. 459 (Texas Civ. App. 1921); *Johnson v. Rudolph Wurlitzer Co.,* 197 Wis. 432, 222 N. W. 451 (1928).

We think that the trial court was correct in directing a verdict for the defendants, for as was said in *Fresh v. Cutter*:

"Without reviewing the decided cases, it may be said, that the weight of authority is to the effect that the mere fact of the communication being voluntarily made, does not necessarily exclude it as a non-privileged communication; for a publication warranted by an occasion apparently beneficial and honest, is not

actionable in the absence of express malice (citing authorities). * * * It is a question for the Court whether the statement if made in good faith and without malice is thus privileged. But the plaintiff has the right notwithstanding the privileged character of the communication to go to the jury, if there be evidence tending to show actual malice, as when the words unreasonably impute crime, or the occasion of their utterance is such as to indicate, by its unnecessary publicity or otherwise, a purpose wrongfully to defame the plaintiff (citing cases). Or, malice may be established by showing that the publication contained matter not relevant to the occasion (citing authority). Expressions in excess of what the occasion warrants do not *per se* take away the privilege, but such excess may be evidence of malice (citing cases)." 73 Md. at 93-94.

We conclude that the court below properly found no evidence of actual malice which would deny the privilege on which the defendants quite properly relied and correctly granted the motion for a directed verdict.

*Order affirmed; costs to be paid by appellants.*