## ORRISON *v.* VANCE

[No. 449, September Term, 1970.]

*Decided June 1, 1971.*

286

*Motion for reconsideration and rehearing filed June 30, 1971; denied September 13, 1971.*

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Arthur Dale Leach* for appellant.

*James F. Vance* and *Charles L. Richards* for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

The casus belli here is the following letter sent by the

appellee (Vance) to the County Commissioners of Prince George's County on 19 October 1969:

"Re:  Deathtraps for Little Children at 8400 Oxon Hill Road

"Mr. Chairman and Members of the Board,

"For a number of years the premises of Suburban Appliances, Charles E. Orrison [the appellant], proprietor, has stored in his yard large numbers of refrigerators, washing machines and other appliances. In no case, so far as I have been able to determine, have these appliances been rendered safe by removal of doors or of door latches, or in other ways prevention of the doors closing.

"This is a very dangerous situation. The Fort Foote Elementary School and Kindergarten is less than 200 yards away, where many hundreds of little children attend school. This situation has been brought to attention of County officials repeatedly over a long period of time, but no adequate corrections have taken place. I wonder if our officials are waiting for one or more children to be suffocated before this matter is remedied.

"Prince George's County Ordinance Section 12-8 [1] may apply, according to your attorney Mr. Albert Lochte. I spoke also to State's Attorney assistant, Mr. Kenkel, who advised me that he thought a prosecution under this section under the circumstances could succeed.

---

1. Section 12-8. Same—Outdoor storage

In the event any refrigerator, icebox, deep freeze, stove, kitchen range, clothes hamper or other appliance containing a compartment, equipped with an automatic locking device or mechanism, shall be stored outdoors, such compartment shall be securely fastened in such manner that such compartment cannot be opened; provided that it shall not be necessary to fasten such compartment where the premises are under the immediate supervision of a responsible adult person.

But *see* footnote 6 for the amended version adopted 18 May 1971.

"At my request, Officer Sellman of the Oxon Hill Station visited the premises last Tuesday or Wednesday, as I recall. He reported to me that he did not believe the situation violated the ordinance because: (a) Most of the refrigerators and other appliances stored outside were behind a four-foot high cattle fence; (b) Those outside the fence did not have mechanical latches, but the refrigerator doors were held shut by magnetic catches; and (c) after his first visit these refrigerators — some 6 to 8 of them —were faced toward each other making it difficult for a child to get into them.

"During the past few days, Mr. Orrison has constructed an 8 foot board fence with a gate between Oxon Hill Road and his open storage area for these refrigerators. Officer Sellman told me that he had a colored man watchman on the premises when he arrived there between 6:00 p.m. and 7:00 p.m. I am advised that the watchman sleeps at his home some 200 yards distant. (The 4-foot cattle fence enclosure of a score or more refrigerators was built about two years ago as a palliative after complaint was made to Md-Nat'l P&PC.)

"Ordinance Section 12-8 may need clarification with respect to magnetic latches as well as mechanical latches. (Please see enclosed materials which make it clear that such refrigerators are a definite menace to little children.) If this section needs clarification as to what is meant by 'immediate supervision' by a responsible adult, I request that such revision also be made. I do not think that the language of the ordinance should remain so unclear that an officer such as Mr. Sellman cannot interpret it.

"As a matter of fact, Officer Sellman told me that he was aware of another business property on Central Avenue where conditions were at

least as bad as those at 8400 Oxon Hill Road. I am not critical of Officer Sellman, who I believe was doing the best he could under the circumstances.

"There is no question in my mind that the Ordinance Section 12-8 makes no distinction between refrigerators and other appliances behind cattle fences or board fences, and I don't think such a distinction should be made. Yet it appears that such jerry-made substitutes for compliance with the law are being substituted by Md-P&PC. While it may serve as a minor deterrent to danger, I apprehend that it is in the long run a very unsatisfactory substitute for safety.

"Mr. Orrison's newly built 8-foot board fence is likewise an attempt to circumvent the law. Access to his junkyard storage of refrigerators — 40 or more — may also be had by children from the sides and rear of the 8400 Oxon Hill Road property where nothing more than a decrepit 4-foot cattle fence is found. This is no safeguard that we should be satisfied with.

"If the County Commissioners are satisfied that such fencing of refrigerators, and other such appliances is safe, contrary to the findings of the federal government and the National Safety Council, this should be spelled out in the Ordinance, and the law should apply equally to everyone. If this is not safe, then Mr. Orrison should be required to comply with the law to protect the lives of little children in the neighborhood, since he apparently will not do so otherwise.

"I might also mention that the very conscientious Justice of the Peace at the Oxon Hill Police Station where I went to swear out a warrant also found difficulty with Ordinance Section 12-8.

"Therefore, the buck stops with you, our Board of County Commissioners, to make appropriate

investigation of this situation and to take remedial action of (a) amendment of the Ordinance of (b) enforcement of the Ordinance, or both. Perhaps all that is necessary is to use the Zoning Ordinance. The premises is a non-conforming use, with nothing in the non-conforming use apparently permitting outdoor storage of refrigerators and electric appliances.

Yours truly,
/s/ James F. Vance

"A collection of authoritative references is enclosed." [2]

On 10 December 1969 Orrison sued Vance "for slander, libel and defamation of character." Thereafter Vance took Orrison's deposition and Orrison took Vance's deposition. In April 1970, on Orrison's suggestion and affidavit, the case was removed to the Circuit Court for Calvert County. On 23 September the case came on for a hearing before the trial judge, Bowen, J., on Vance's motion for summary judgment. From the granting of the

---

2. Enclosures were "extracted from":
   1. Children. . .and Refrigerator Entrapment, U. S. Department of Health, Education and Welfare, Public Health Service, Division of Accident Prevention, Public Health Service Publication No. 1259, May 1965.
   2. "The Last Hiding Place," Article from the Family Safety magazine published by the National Safety Council, Spring 1968 issue, pages 21-23.
   3. "Trapped in a 'refrigerator'" Article from the Family Safety magazine published by the National Safety Council, Spring 1962 issue, page 2.
   4. Preventing Child Entrapment in Household Refrigerators, U. S. Department of Health, Education and Welfare, Public Health Service, Division of Accident Prevention, Public Health Service publication No. 1258, 1964.
   5. "The Deadly Playhouse," Article from the Family Safety magazine published by the National Safety Council, Spring 1963 issue, pages 4-7.
   6. Hazards of Discarded Iceboxes and Refrigerators, Safety Education Data Sheet No. 62, published by the National Safety Council, 1954.
   7. Home-Farm News Notes, published by the Accident Prevention Section, North Carolina State Board of Health, September 1969.

motion and the ensuing judgment for costs, Orrison has appealed.

Vance, a member of the bar, is employed by the federal government. He devotes a part of his spare time to a law practice which is confined to his neighborhood. He is active in civic affairs and he has been president of a local citizens' association. As he put it:

> "If I were to go back for the years I lived in Prince George's County and tell you how many instances we have requested the County officials to investigate problems and to take remedial action, it would take a half-hour—things about roads, things about garbage collection, things about school bus service. That's the normal interest * * * of persons who are concerned about improving the quality of their community."

Prior to his letter to the county Vance asked an Associate County Attorney if there was a law relating to the storage of refrigerators. He was told there was such a law.[3] He made it his business to get in touch with the State's Attorney's office and with the county police whom he informed of possible violations of the law by Orrison. Both agencies inspected Orrison's premises and, we were told, neither of them found any violations of the law as it then existed. After he wrote the letter to the Commissioners he discussed the matter with neighbors who shared his concern.

---

3. Code (1971 Repl. Vol.), Art. 27, § 334:
"§ 334. Abandoned and discarded.
"It shall be unlawful for any person, firm or corporation to place, or permit the placing outside of any building or dwelling in a place accessible to children, of any abandoned and discarded ice box, refrigerator or freezer cabinet which is uncrated and has a door or a lock which cannot be released for opening from the inside thereof. Any person, firm or corporation violating any of the provisions of this section shall, upon conviction thereof, be deemed guilty of a misdemeanor and fined not more than one hundred dollars ($100) or imprisoned in jail for not more than thirty (30) days, in the discretion of the Court."
And *see* footnotes 1 and 6.

Inquiry must be directed first to the question whether there exists a genuine dispute of a material fact, and then to the question whether Vance was entitled to judgment as a matter of law. Maryland Rule 610. In our consideration of these questions we have looked upon the evidence which was before Judge Bowen in a light most favorable to Orrison and we have resolved all logical and reasonable inferences deducible therefrom against Vance. *Brown v. Suburban Cadillac*, 260 Md. 251, 255 (1971).

Our review of the record has not persuaded us that there is a genuine dispute as to a material fact. Orrison has set forth in his brief a list of "disputed facts." No useful purpose will be served by a discussion of them. Some are mere semantic quibbles; others concern only conclusions of law; of the few that might be considered "genuine" disputes none, in our judgment, is material.

Firmly established is the notion that some communications, otherwise libelous, may be privileged, either absolutely or qualifiedly. *Stevenson v. Baltimore Baseball Club, Inc.*, 250 Md. 482 (1968). Since we think the words spoken and written by Vance enjoyed, in these circumstances, a qualified privilege it will not be necessary for us to consider or discuss the question whether his words were libelous.

That some words need saying is a notion which has ancient validity but the qualified privilege which usually attends their saying must be exercised in a reasonable manner and for a proper purpose for if the speaker abuses the occasion of their utterance he will forfeit his immunity. The controlling principles of this phase of the law have been stated with clarity and precision in two recent cases, *Stevenson v. Baltimore Baseball Club, Inc., supra,* and *Wetherby v. Retail Credit Co.*, 235 Md. 237 (1964), so we shall not repeat them here.

Our inquiry begins with the subsidiary question whether the information itself and those who received it are of a kind and character which will allow Vance to claim privilege. In this regard we look to the relationship between Vance and the recipients, the legal, moral or so-

cial duty impelling him to transmit the information, and whether he did so in good faith. *Simon v. Robinson,* 221 Md. 200 (1959) ; *Fresh v. Cutter,* 73 Md. 87 (1890). Undoubtedly there are many varieties of situations in any of which the conditional or qualified privilege might arise, W. Prosser, *Law of Torts* §§ 593-612 (1964), and were we obliged to fit the instant case into a convenient and recognizable slot we think it will be found in Restatement, *Torts* § 598:

> "An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that
> (a) facts exist which affect a sufficiently important public interest, and
> (b) the public requires the communication of the defamatory matter to a public officer or private citizen and that such person is authorized or privileged to act if the defamatory matter is true."

Vance saw what to him was a "very dangerous situation." Orrison insists Vance put it much too high, perhaps even bending the truth to some extent. Whether Vance's observation of the condition of Orrison's property was sufficiently comprehensive or whether he related what he did see with reasonable accuracy is somewhat beside the point. The question is not whether Orrison obeyed the law but whether Vance was justified in saying what he did say. The letter clearly reveals that Vance thought there was still some danger in the situation, since Orrison's efforts in this regard were inadequate and at best amounted only to pro forma compliance with the law. Even more significant, however, is Vance's insistence that, despite Orrison's pro forma compliance, the law ought to be changed.[4] He was trying to eliminate what he thought was a very real danger and we are quite unwilling to say that he was not justified in thinking that the danger still existed. Moreover, the State's At-

---

4. The law was changed; perhaps as a result of Vance's activity.

torney, the police, the commissioners and their attorney were certainly reasonable recipients of the communications and the citizens to whom he spoke shared his interest in obviating the danger. *Simon v. Robinson,* supra; *Fresh v. Cutter, supra.* We think his efforts in this regard were conditionally privileged.

Orrison, of course, argues that because Vance's statements were made with "actual malice" he has forfeited his immunity. *Henthorn v. Western Md. Ry. Co.,* 226 Md. 499 (1961); *Stevenson, supra; Fresh, supra.* But Orrison has the burden of proving not only actual malice but also that the statements are false. *Wetherby, supra.* And he argues also that ordinarily actual malice is a jury question, and we agree, *Stevenson, supra;* 50 Am.Jur.2d, *Libel and Slander* § 198, but we see nothing in this record which suggests the presence of actual malice sufficient to defeat Vance's privilege or even to justify the submission of the issue to a jury.

It has been said that no word in the law is used more loosely than the word "malice," 1 Harper and James, *The Law of Torts* § 5.27, 450 (1956), and quite likely this is true. Perhaps, in this context, a more precise expression would be "abuse of privilege." Significant in rebutting privilege is the speaker's motive which

> "* * * must be some motive inconsistent with the social policy which gives rise to privilege and which affords prima facie immunity to the defendant. If it appears that the defendant has attempted to use the circumstances and the occasion for a purpose not within that for which the immunity is extended, the privilege is abused and he is liable. And this is as it should be. If the communication is made, not at all for the purpose of protecting interests legally recognized, nor in the performance of a duty which the law encourages, 'the pretense under which it is made, instead of furnishing a defense, will aggravate the case.' [*Fairman v. Ives,* 5 B. & Ald.

642, 106 Eng. Rep. 1325, 1328 (1822).] It is thus seen that 'actual malice' really does not exclusively mean ill-will. It is better described as an improper purpose, i.e., a purpose inconsistent with the social policy which it is the purpose of the law to secure by the technical device of privilege." *Id.* at 452.

We have said that, in this context, malice means "a reckless disregard of truth, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will." *Stevenson, supra* at 487. In determining an abuse of privilege all relevant circumstances are admissible, *Foley v. Hoffman,* 188 Md. 273 (1947), including the defendant's reasonable belief in the truth of his statements, *Simon, supra,* the excessive nature of the language used, *Stevenson, supra, Fresh, supra,* whether the disclosures were unsolicited, *id.*, and whether the communication was made in a proper manner and only to proper parties, *Kennedy v. Cannon,* 229 Md. 92 (1962). Of course, any relevant specific facts in support of the factors just mentioned and any other evidence of abuse or the absence of abuse are admissible.

All that Orrison has come up with is the fact that Vance does not like him, pointing to other litigation, *Price v. Orrison,* 261 Md. 8 (1971), and Vance's statement to that effect.[5] Clearly Orrison is not a hero to Vance and there is little doubt Orrison considers Vance a low fellow. But, in these circumstances, this is not evidence of ill-will. Had this been an isolated case of "civic concern," completely without foundation and following a re-

---

5. In his deposition Vance said, "I have got nothing to say about him personally. I simply don't want anything to do with him. Did you ever hear the little rhyme of Dr. Fell?"
Vance must have had in mind Thomas (Tom) Brown's (1663-1704) translation of Martial's (A.D. 40-102) epigram, "Non amo te, Sabidi * * *." Brown's version is:
"I do not love thee, Dr. Fell,
The reason why I cannot tell;
But this alone I know full well,
I do not love thee Dr. Fell."

cent acrimonious confrontation, we might find it difficult to put aside the possibility of ill-will. But Vance's record over the years of bringing to light all kinds of community problems puts the matter in a somewhat different context. It is common knowledge that unused refrigerators accessible to children are dangerous and that this is an area of legitimate public concern. Much is made of the fact that Orrison did improve the fencing but it is clear, we think, that this is not the complete answer.[6] Children have been known to get over, under, through and around fences. As we see it there is little or no significance in the fact that there was no love lost between Orrison and Vance.

We see no reason for disturbing the judgment entered by Judge Bowen.

*Judgment affirmed.*
*Costs to be paid by the appellant.*

---

6. Oddly enough (our information comes from an independent source dehors the record) the County Council, on 18 May 1971, amended Sections 12-7 and 12-8 of the Prince George's County Code of Ordinances and Resolutions to read as follows:

"Section 12-7 Refrigerators, Iceboxes, etc. Abandoned, Discarded, etc.

"It shall be unlawful for any person to discard or abandon any refrigerator, icebox, deep freezer, stove, kitchen range, clothes hamper or other appliance containing a compartment, equipped with a locking device or mechanism, unless such compartment has been rendered incapable of being locked either by removal of the door of such compartment or by removal of the locking device or mechanism.

"Section 12-8 Same—Outdoor Storage

"In the event any refrigerator, ice box, deep freeze, stove, kitchen range, clothes hamper or other appliance containing a compartment, equipped with a locking device or mechanism, shall be stored outdoors, such compartment shall be securely fastened in such manner that such compartment cannot be opened."