508 A.2d 142

EXXON CORPORATION, USA

v.

Daniel L. SCHOENE, et ux.

No. 927, Sept. Term, 1985.

Court of Special Appeals of Maryland.

May 9, 1986.

Jonathan D. Smith (Donald E. Sharpe and Piper & Marbury, on brief), Baltimore, for appellant.

David A. Castro and Samuel F. Kenney, Towson, for appellees.

Argued before MOYLAN, BLOOM and KARWACKI, JJ.

KARWACKI, Judge.

This is an appeal and cross appeal from final judgments rendered by the Circuit Court for Baltimore County in an action filed against Exxon Corporation and its employee, Arthur Lent, by Daniel Schoene and his wife, Debora Schoene. In that suit Daniel Schoene claimed compensatory and punitive damages for assault and battery, malicious prosecution, and slander. His wife joined him in a claim for loss of consortium resulting from that alleged tortious conduct for which they sought both compensatory and punitive damages.

Arthur Lent was never served with process in the action which proceeded to trial before a jury against Exxon alone. At the close of the plaintiff's case, the court granted Exxon's motion for judgment on the assault and battery counts and the claims of loss of consortium allegedly resulting therefrom. At the close of all of the evidence the court granted judgment in favor of Exxon on the counts based upon malicious prosecution.

The jury returned verdicts in favor of Daniel Schoene on his claim of slander and in favor of him and his wife on their joint claim of loss of-consortium which resulted from the defamation of Daniel Schoene. $17,500 in compensatory and $55,000 in punitive damages were awarded on the slander claim; $40,000 in compensatory and $25,000 in punitive damages were assessed for loss of consortium. Judgments were entered on those verdicts as required by Rule 2–601.

Exxon timely moved for judgment notwithstanding the verdict or, in the alternative, for a new trial pursuant to Rules 2–532 and 2–533. The court on May 17, 1985 denied a new trial, but granted judgment n.o.v. for Exxon on the loss of consortium count as to the award of punitive damages, and purporting to act under Rule 2–532, reduced the judgment for compensatory damages on that count from $40,000 to $5,000. Exxon raises four issues in its appeal from the judgments thus finalized, and the Schoenes raise three

additional issues in their cross-appeal. Exxon's questions are these:

    I.   Were the allegedly slanderous statements made by one Exxon employee to a former Exxon employee about missing company funds privileged?

    II.  Was there any evidence sufficient to award compensatory or punitive damages for the alleged slander?

    III.  Did the trial court err by submitting the loss of consortium claim to the jury when there was no evidence of physical injury caused by the alleged slander?

    IV.  Did the trial court err by denying the motion for new trial on the slander counts given the prejudicial effect of the evidence concerning claims for which Exxon was not responsible?

The Schoenes ask:

    I.   Whether punitive damages are ever available to prevailing plaintiffs on a claim of loss of consortium.

    II.  Whether a trial court may set aside, reduce, alter or amend the verdict of the jury pursuant to a motion for judgment n.o.v.[1]

    III.  Whether the trial court was justified in reducing the amount of compensatory damages on the ground

---

**1.** The court erred in modifying the judgment rendered on the jury verdict awarding compensatory damages. Where a trial judge's conscience is shocked by the amount of damages awarded by the jury, a new trial may be granted unless the plaintiff agrees to a remittitur of the damages awarded. *Millison v. Clarke,* 32 Md.App. 140, 143–45, 359 A.2d 127, cert. denied, 278 Md. 728 (1976); *Cheek v. J.B.G. Properties, Inc.,* 28 Md.App. 29, 42–43 (1975). That practice, under former Rule 567 governing new trial motions, has not been affected by the adoption of New Rule 2-533. Likewise, Rule 2-532 governing motions for judgment n.o.v. does not permit the trial judge to modify the jury's verdict on damages. It has not expanded the role of the court, in ruling on such a motion in that regard, from what it was under former Rule 563. *Battista v. Savings Bank of Baltimore,* 67 Md.App. 257, 507 A.2d 203 (1986).

that the evidence was insufficient to support the award.

## The Facts

The events which led up to this litigation began in March of 1977. It was then that Daniel Schoene began to work for Alert Oil Company (Alert), a division of Exxon, as an attendant in their Lansdowne station. In April, 1977 Schoene was made a shift manager of the station, promoted again a few months later to assistant manager, and was made manager of the station in late 1977.

One of Schoene's responsibilities as manager was accounting for the cash collected at the station from the sale of gasoline and other products. The customary procedure for handling this money was for the station attendants to place the cash received from customers into an envelope, record the amount on a "drop log," [2] and place the envelope into a "drop safe." [3]  This procedure had to be witnessed by either Schoene, if he was there, or another employee, who would also sign the drop log. An armored car would arrive at the station daily to collect the previous day's receipts. The driver of the armored car had the key to the dial, and only Schoene knew the combination of the safe. The two men would open the safe, Schoene would check the drop log to make sure that all the envelopes were accounted for, and Schoene would then turn the envelopes over to the armored car driver for delivery to the bank. Schoene, in addition to being responsible for the daily cash receipts, was responsible for the station's petty cash funds. He had a key to the safe in which these funds were kept. The station's operations and Schoene's cash accounting were audited periodically by Arthur Lent, an area manager for Alert.

---

**2.** The drop log is a tally sheet upon which are recorded the amounts that each attendant collects and remits.

**3.** The drop safe is a combination safe with a locked dial. The attendants would drop the envelope through a slot in the locked safe.

Cash shortages were a problem at the Lansdowne station. Lent often discussed the shortages with Schoene, insisting that they would have to cease. During the weeks between June 30, 1978 and September 12, 1978, the shortages at Schoene's station totalled almost $2,200. There was evidence at the trial that shortages also occurred at other Alert stations in Maryland, but that they averaged about $150 to $200 per month. On September 28, 1978, Lent and his immediate superior at Alert, Edward Thomas, discussed what should be done to remedy the problem of continuing poor cash accounting by Schoene. Thomas instructed Lent that John Coleman, Exxon's security agent, should be briefed, and a meeting should be arranged at the station between Schoene, Lent, and Coleman.

Lent telephoned Schoene at the station early in the morning of October 2, 1978. Lent told him not to do a monthly report and not to allow the armored car driver to pick up the previous day's receipts because Lent was going to come to the station that day. Schoene replied by quitting his job. Schoene then told another employee at the station that he was quitting, gave that employee his keys, and left. Lent later arrived at the station, conducted an audit of the station's records, and found that the shortages for September amounted to about $2,600.

Having missed the opportunity of discussing the station's shortages with Schoene on October 2, Lent went to see Schoene on the evening of October 5. Lent found Schoene at the Linthicum Seafood House, a restaurant owned by Schoene's brother-in-law, seated at a table with his wife and his brother, Dwayne. In their presence, and with patrons of the restaurant nearby, Lent confronted Schoene. Debora Schoene and Dwayne Schoene testified that Lent was angry when he approached the table. Lent spoke first and said "hello" to everyone.

According to Schoene, the following exchange took place:

He said that he wanted to see me down at the station, and I asked him why. I said, I don't work for you

anymore. He said, because you have a problem, and I don't want to embarrass you right here, and I said, what's the problem? He said, let me see. He said, you are missing $2,800 . . . .

One witness, who knew the Schoenes and who was at the table next to them, testified that Lent had rushed into the restaurant, and had immediately accused Schoene of stealing money and using it to buy a new van. There was also testimony that Lent struck Schoene in the face. Dwayne Schoene testified that Lent had accused his brother of stealing from the station. Debora Schoene testified that Lent accused her husband of being a coward. Soon after this confrontation the parties moved outside of the restaurant. Lent's aggressive posture changed rapidly, and he became very emotional and began to cry. Debora Schoene testified that Lent apologized to Schoene, saying that he loved Schoene as his Christian brother and that the Lord would forgive him if he took the money. Schoene remembered that Lent told him, "I know you didn't do this, that Debbie would kill you if you did."

The next day, Schoene and his wife met with Lent and Coleman at the Alert station. The shortages were discussed, but no accusations were made. Schoene indicated to Coleman that it was possible that another employee had taken the money. Later, Lent reported to the Baltimore County Police that money was missing from the Lansdowne station. Following an investigation, a warrant was issued on December 6, 1978 for the arrest of Schoene on charges of larceny after trust in connection with the missing funds. He was tried and acquitted of the criminal charges on March 19, 1979.

### Privileged Defamation

For reasons of public policy, the law of defamation recognizes certain communications as privileged, and thereby affords those who publish such communications immunity from liability. The privilege, and the resultant immunity enjoyed by the publisher, may be either abso-

lute or qualified. As we explained in *DiBlasio v. Kolodner*, 233 Md. 512, 197 A.2d 245 (1964), "[a]n absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused." 233 Md. at 522, 197 A.2d 245. *See also Adams v. Peck*, 288 Md. 1, 3, 415 A.2d 292 (1980) ("absolute privilege protects the person publishing the defamatory statement from liability even if his purpose or motive was malicious, he knew that the statement was false, or his conduct was otherwise unreasonable"); *Orrison v. Vance*, 262 Md. 285, 292, 277 A.2d 573 (1971) (qualified privilege "must be exercised in a reasonable manner and for a proper purpose" or the speaker "will forfeit his immunity"); Note, *Developments in the Law—Defamation*, 69 Harv.L.Rev. 875, 917 (1956).

*Miner v. Novotny*, 304 Md. 164, 167–68, 498 Md. 269 (1985).

In this case Exxon asserts that the defamatory statements uttered by Lent at the Linthicum Seafood House on October 5, 1978 were absolutely privileged, and that the trial court erred in denying its motion for judgment at the conclusion of the evidence. In the alternative, it argues that those defamatory statements were published by Lent under circumstances which gave rise to a qualified or conditional privilege, and that the trial court erred in refusing to instruct the jury on the scope of the conditional privilege and whether it had been forfeited by abuse.

Absolute Privilege

■ Exxon maintains that Lent did not make the slanderous statements in issue until after Schoene twice invited his comments. It argues that when Lent walked into the restaurant on October 5, 1978, Schoene knew why he was there. Exxon contends that Schoene's first "invitation" to Lent to make a slanderous comment came when Lent said that he wanted to see Schoene at the station. Schoene

responded, "Why?" The second "invitation" followed almost immediately when Lent answered, "Because you have a problem and I don't want to embarrass you right here," and Schoene responded by saying, "What's the problem?" Exxon concludes that Schoene consented to Lent's statements and that consent clothed Lent with an absolute privilege to publish the defamation of which Schoene now complains.

There is authority recognizing an absolute common law privilege for defamation where the party defamed consents to its publication. *Williams v. School District of Springfield R-12*, 447 S.W.2d 256 (Mo.1969), *overruled on other grounds, Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo.1983); *Costa v. Smith*, 43 Colo.App. 251, 601 P.2d 661 (1979). The Restatement (Second) Torts, § 583 (1977), adopts such an absolute privilege in these terms:

> [T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.

Comment d. under that section indicates the limits on the applicability of this privilege as follows:

> The extent of the privilege is determined by the terms of the consent. These again are to be determined by the language or acts by which it is manifested in the light of the surrounding circumstances.
>
> *        *        *        *        *        *
>
> It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory.

We need not decide in this case whether this species of absolute privilege is applicable in Maryland since we conclude that under the circumstances here present, Schoene in inviting Lent to discuss the "problem" could not reasonably be charged with knowledge that Lent's response would be defamatory. The evidence showed that Schoene and Lent

had on many occasions discussed the cash shortages which plagued the Alert station which Schoene had managed. There was no evidence that on any of those prior occasions Lent had accused Schoene of misappropriating any of Alert's cash receipts. Under these circumstances, the court was not in error in deciding that any absolute privilege based on Schoene's consent to the defamatory publication was not applicable.

Conditional Privilege

■ Statements made within the context of the employer-employee relationship in furtherance of a protection of the employer's property have long been accorded a qualified privilege in this State. *General Motors Corp. v. Piskor*, 277 Md. 165, 352 A.2d 810 (1976); *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976); *Hanrahan v. Kelly*, 269 Md. 21, 305 A.2d 151 (1973); *Peurifoy v. Congressional Motors*, 254 Md. 501, 255 A.2d 332 (1969); *Stevenson v. Baltimore Club*, 250 Md. 482, 243 A.2d 533 (1968), *overruled on other grounds, Marchesi v. Franchino*, 283 Md. 131, 139, 387 A.2d 1129 (1978); *Henthorn v. Western Md. RR. Co.*, 226 Md. 499, 174 A.2d 175 (1961); *Beeler v. Jackson*, 64 Md. 589, 2 A. 916 (1886). Moreover, this privilege extends to such statements even though the person defamed is no longer an employee. *Jacron Sales Co. v. Sindorf, supra; Henthorn v. Western Md. RR. Co., supra; Beeler v. Jackson, supra.*

Lent, in his efforts to discover the reasons for the cash shortages at the Alert station which Schoene formerly managed, enjoyed a conditional privilege for statements made in the course of discussing these shortages with Schoene. Exxon was entitled to have the jury instructed on the existence of that conditional privilege.

The conditional privilege enjoyed by Lent was, however, subject to being forfeited if abused, and there was evidence from which the jury could have found such abuse. The testimony of Lent's retraction of his accusations of theft directed at Schoene in the restaurant after the parties had

moved outside certainly provided a basis for a conclusion that Lent's accusations had been made maliciously, *i.e.*, with "knowledge of falsity or reckless disregard for truth." *Marchesi v. Franchino, supra,* 283 Md. at 139, 387 A.2d 1129 (1978); *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 491 A.2d 1210, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985). Furthermore, whether Lent was reasonably justified in responding to Schoene's invitation to explain why Lent believed that Schoene had an embarrassing problem in the presence of persons who had no interest in the protection of Exxon property was a question for the jury as bearing upon Lent's abuse of his qualified privilege through excessive publication. *General Motors Corp. v. Piskor, supra,* 277 Md. at 173, 352 A.2d 810; *Fresh v. Cutter,* 73 Md. 87, 93–94, 20 A. 774 (1890).

The question of whether a defamatory communication is conditionally privileged is one of law for the court. *Jacron Sales Co. v. Sindorf, supra,* 276 Md. at 600, 350 A.2d 688 (1976); *Mareck v. Johns Hopkins University,* 60 Md.App. 217, 227, 482 A.2d 17 (1984), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985). The issue of whether that conditional privilege has been abused is a matter which the jury must resolve. *General Motors Corp. v. Piskor, supra.* Therefore, we hold that the court erred in refusing to instruct the jury as to the conditional privilege applicable to Lent's statements and as to the manner in which that privilege could be abused. This error requires a reversal of the judgments appealed from and a remand for a new trial. Nevertheless, we shall address those issues raised by the parties in this appeal which are likely to arise in the retrial of this case.

### Loss of Consortium
Compensatory Damages

Exxon asserts that its motion for judgment on the loss of consortium claim should have been granted since Mr. Schoene suffered no physical injury as a result of Lent's defamation. We disagree.

A loss of consortium action is a remedy for an injury to the marital entity. *Deems v. Western Maryland Ry.*, 247 Md. 95, 231 A.2d 514 (1967). Loss of consortium includes the loss of society, affection, assistance, and conjugal fellowship. It encompasses more than the loss or impairment of sexual relations. *MacCubbin v. Wallace*, 42 Md.App. 325, 327, 400 A.2d 461, *cert. denied*, 285 Md. 732 (1979).

■ Although Maryland appellate courts have not previously been presented with the question Exxon poses here, a number of our sister states have examined this issue. We believe the better reasoned cases are those that have held that the spouses' cause of action for loss of consortium may be predicated on a mental or emotional injury to one of them without any accompanying physical harm. *See, e.g., Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (Cal.1980) (Recovery for loss of consortium resulting from negligence in incorrectly diagnosing and treating the plaintiff's wife for syphilis permitted, reasoning that certain psychological injuries can be no less severe and debilitating than physical injuries); *Roche v. Egan*, 433 A.2d 757 (Me.1981) (libel action where court stated that it perceived no reasoned basis for a holding that would make a physical injury a touchstone of recovery for loss of consortium); *Garrison v. Sun Printing & Publishing Ass'n*, 207 N.Y. 1, 100 N.E. 430 (N.Y.1912); *see also,* Annot., 16 A.L.R. 4th 537 (1982); Prosser, *Torts,* § 125 (5th ed.1984); 41 Am.Jur.2d, *Husband and Wife,* § 451 (1968).

■ In *Deems,* Judge Oppenheimer for the Court of Appeals observed how both spouses suffer from "any resultant change of the husband's personality or ability to engage in all the intangible associations which marriage brings ...." *Deems,* 247 Md. at 108–09. Judge Oppenheimer was there discussing the harm to the marital relationship that a *physical injury* can cause to one spouse's personality or ability to engage in "intangible associations which marriage brings." We find no reason to distinguish between a "resultant change" in one of the partners to a marriage stem-

ming from a physical injury or from an emotional injury. Thus, we hold that it was proper for the jury, having determined that Schoene had been slandered and that defamation had resulted in loss of consortium in his marital relationship, to award compensatory damages for that loss even though he suffered no physical harm.

Punitive Damages

■ When the jury returned a verdict for punitive damages for loss of consortium as well as for slander, the trial court properly set it aside. *General Motors Corp. v. Piskor, supra,* 277 Md. at 174–75, 352 A.2d 810; *Montgomery Ward & Co. v. Cliser,* 267 Md. 406, 424–25, 298 A.2d 16 (1972). On remand if the Schoene's again offer legally sufficient evidence entitling them to punitive damages, the jury should be instructed to return only one punitive damage verdict for defamation and loss of consortium.

JUDGMENTS REVERSED;

CASE REMANDED FOR A NEW TRIAL; COSTS TO BE DIVIDED BETWEEN THE APPELLANT AND THE APPELLEES.