INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL
1805, AFL-CIO *v.* HENRY
C. MAYO

[No. 126, September Term, 1976.]

*Decided March 9, 1977.*

The cause was argued before MORTON, POWERS and MASON, JJ.

*Ann F. Hoffman*, with whom were *Bernard W. Rubenstein* and *Edelman, Levy & Rubenstein, P.A.* on the brief, for appellant.

*John A. Blondell*, for appellee.

POWERS, J., delivered the opinion of the Court.

Changes made by Henry C. Mayo, an Inspection Supervisor at a plant of Westinghouse Electric Corporation in Anne Arundel County, on the weekly time card of an employee under his supervision, constituted the first of a series of events which resulted in this appeal.

It is something of an anomaly that the merits of the original dispute — whether the supervisor's action was right or wrong — have no bearing on the issues in this case. It is necessary, however, that we set out the facts as they occurred, in order to understand, in their proper perspective, the issues which later developed.

On Saturday, 20 October 1973, W. A. Sparks, an Inspector employed at Westinghouse, turned in his weekly time card to Mayo, his supervisor. It was the supervisor's duty to verify that hours worked and absent time were properly reported, sign his approval, and forward the time card to payroll. The card turned in by Sparks showed that he worked 8.0 hours on Monday, Tuesday, Friday and Saturday of that week. By using the Absence Symbol "C", Sparks classified his absences on Wednesday and Thursday as vacation days. Mayo gave the card back to Sparks, telling him to correct it, because Wednesday and Thursday had not been authorized as vacation time, and must be classified as voluntary absences.[1] Sparks returned the time card, unchanged. Mayo

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, June 1, 1977.

1. It appears that if the absences were authorized vacation, the Saturday work was overtime, at a higher rate of pay. If the days off were voluntary

consulted his superior, John Brothers, Manager of Quality Control. Brothers instructed Mayo to change the Absence Symbol from "C" to "A", indicating voluntary absence. Mayo made the changes, and then approved and forwarded the time card.

Sparks, a member of International Brotherhood of Electrical Workers, Local 1805, AFL-CIO, consulted Lenora Brach, his union steward. She presented two Grievances, signed by Sparks as the aggrieved employee and by her as steward. The descriptions of the grievances were as follows:

"Grievance Serial # 3680 I

Management did violate company rule number 11, altering or falsifying company documents. On October 24th 1973 Mr. H. Mayo foreman of Inspection on second shift under his Superior Mr. J. Brothers instructions did falsify employee W. Sparks IBM weekly time card by changing a C absence (vacation day) to an A absence for October 17th and 18th 1973, without employee W. Sparks permission.

The Union has had several cases where employees have falsified company documents and were suspended. The Union contends that Management has no right in violating company rule number 11 than does the employees, and that W. Sparks IBM weekly time card be changed back to a C absence instead of an A absence."

"Grievance Serial # 3681 I

Management is in violation of Article Nine Section Four (e), in not paying W. Sparks time and one half for working Saturday October 20, 1973.

---

absences, the Saturday work was at straight time. There was evidence that it was the company's position that vacation time was required to be scheduled in advance, and not after the fact, but that the union contended that an employee was entitled, after the fact, to classify an absent day as vacation time. The issue was then under dispute between the company and the union.

Management changed his weekly IBM card from C (vacation day) to A (absent day).

This the Union will not tolerate. W. Sparks time card must be changed to show a C absence (vacation day) for October 17th and 18th instead of an A absence, so he will be qualified for overtime pay for eight hours on Saturday the 20th of October."

After they were filed, the grievances received consideration at various steps or levels as prescribed in the established grievance procedure.

In the November 1973 issue of "Intercom", a newspaper owned and published by Local 1805, the following were among a number of items published under the heading, "Grievance Report":

"3681I—L. Brach        2nd Shift
Supervisor H. Mayo falsified employee's I.B.M. Weekly Time Card. Is a violation of Company plant rule # 11. Submitted to the second step on 10-31-73, awaiting meeting."

"3680I—L. Brach        2nd Shift
Management violated Art. IX, Section 4 (e) in not paying aggrieved time and a half for Saturday, 10-20-73. His weekly I.B.M. time card was changed from vacation (C) to absent (A) days. Submitted to the second step 10-31-73, awaiting meeting."

We set forth both grievances, and both news items, not only because of the significance as an issue in the case of the difference between the grievance as actually stated and the news report of the grievance, but because it is apparent that the news report erroneously switched the two grievance numbers. This transposition error is of no importance, but we take note of it to avoid possible confusion.

There was evidence that at a December 1973 meeting between management officials and union officials, for the so-called third step of the grievance procedure, the management officials explained that the information in the

"Intercom" "had terribly upset Mr. Mayo", and asked if it could in some way be retracted or changed. The request was made to Mr. Bailz Elza, vice-president of Local 1805, an assistant editor of "Intercom". He was also asked to consider rewriting the grievance "so that we could settle the issue, the real issue", and it would not be printed in such a manner in the "Intercom". He did not agree. The next issue of "Intercom", April 1974, printed the item:

> "3681I—L. Brach          2nd Shift
> Supervisor falsified employee's I.B.M. Weekly Time Card. In violation of Company plant rule #11. Requested 4th step 3-14-74."

In October 1974 Mayo filed a suit in the Circuit Court for Anne Arundel County against International Brotherhood of Electrical Workers, Local 1805, AFL-CIO and ten individuals, all associated with Local 1805 and some also associated with the newspaper Intercom. The declaration contained two counts. In the first Mayo alleged that all of the defendants published a defamatory statement about him as follows:

> "Page Two — Intercom — November 1973
>
> Grievance Report
>
> 3681I—L. Brach          2nd Shift
> Supervisor H. Mayo falsified employee's I.B.M. Weekly Time Card. Is a violation of Company plant rule #11. Submitted to the second step on 10-31-73, awaiting meeting."

In the second count he incorporated the allegations of the first count, and alleged that the defendants acted jointly and in concert with one another.

All defendants joined in a single responsive pleading entitled "Answer To Declaration", in which they pleaded "That they did not commit the wrongs alleged."

The case was tried before a jury and Judge E. Mackall Childs on 25 and 26 September 1975. At the close of the

plaintiff's evidence the defendants moved for a directed verdict. The motion was granted as to the second, or conspiracy, count, and it was also granted as to all of the individual defendants, leaving only the claim against Local 1805, as set forth in the first count of the declaration.

Upon completion of the defendant's evidence, the court instructed the jury, objections to the instructions were noted, and counsel made their arguments to the jury. A verdict was returned in favor of Mayo against Local 1805 for compensatory damages of $1.00 and punitive damages of $5,000.00. A motion for judgment n.o.v. was made and denied. Judgment was entered on the verdict. This appeal was taken.

Appellant presents these questions:

1. Did Appellant enjoy a qualified privilege as a matter of law to publish the alleged libel?

2. Was there competent evidence to support an award of compensatory damages?

3. Does an award of $1.00 in compensatory damage support an award of $5,000 punitive damages?

4. Did the Court commit reversible error in instructing the jury that it could infer that Appellant sought to have Appellee discharged?

## Qualified Privilege

Appellant argues that the court erred in failing to instruct the jury that it had a qualified privilege as a matter of law to publish the alleged libel. The argument is one of semantics, not of substance.

It would be unnecessarily repetitive for us to undertake an extensive discussion of the qualified, or conditional privilege, as it is recognized in the law of defamation. That privilege was one of several aspects of libel and slander which were reexamined by the Court of Appeals, in the light of *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974), in its opinion in *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A. 2d 688 (1976). After having

adopted negligence as the standard to be applied in Maryland in cases of purely private defamation, 276 Md. at 596, the Court said, at 598:

"It has been suggested that adoption of the negligence standard of fault in defamation cases would have the practical effect of rendering obsolete the common law defense of conditional privilege. *See, e.g.,* Anderson, *supra,* 53 Texas L. Rev. at 443, n. 97; Frakt, *supra,* 6 Rutgers-Camden L. J. at 496-97. The reasoning which underlies this position is that many jurisdictions follow the rule that one of the means by which a conditional privilege may be defeated is by proving negligence on the part of the defendant. F. Harper & F. James, *supra,* § 5.27; W. Prosser, *supra,* § 115."

The Court rejected that reasoning. It said, at 598-99:

"In Maryland, however, we have never held that negligence is among the grounds on which the conditional privilege may be forfeited.

"The Maryland cases on abuse of conditional privilege are couched in terms of 'express malice' or 'actual malice.'"

\* \* \*

"Express or actual malice represents something· more than conduct that is merely negligent."

Referring to its definition of malice found in *Stevenson v. Baltimore Club,* 250 Md. 482, 243 A. 2d 533 (1968), and *Orrison v. Vance,* 262 Md. 285, 277 A. 2d 573 (1971), the Court said, in *Jacron,* at 600:

"\* \* \* thus the reckless disregard standard now appears to be firmly established in Maryland as a test, albeit not the exclusive test, for abuse of a conditional privilege. This being a higher standard than negligence, we retain the common law conditional privilege in Maryland which, in a given

case may suffice to avoid liability even though the *Gertz* standard regarding falsity and defamation is met by the plaintiff."

\* \* \*

"While the question of whether a defamatory communication enjoys a conditional privilege is one of law for the court, whether it has been forfeited by malice is usually a question for the jury."

The net result of what the Court said in *Jacron* about the common law conditional privilege in Maryland was that the law remained the same. The respective functions of the court and jury could be paraphrased thus:

In a libel or slander trial, the judge decides whether a defendant has the privilege when he walks into the courtroom; the jury decides whether he still has it when he walks out.

The fallacy in appellant's argument is that it contends that it "enjoyed a qualified privilege to print the item in question, even if it were libelous", and that the judge should have told the jury that this was so as a matter of law. Of course, such an instruction would have amounted to directing a verdict for the defendant, something that the court was not asked, by appropriate motion at the close of all the evidence, Rule 552, to do. Also, it would have ignored the existence of several factual issues, which the court should have, and did, submit to the jury.

In another recent case, *Hanrahan v. Kelly*, 269 Md. 21, 305 A. 2d 151 (1973), the Court of Appeals considered the defense of conditional or qualified privilege. Copies of a letter which defamed the addressee had been sent to several other persons, who may have shared with the writer, a mutual interest in the subject matter. Also, the letter had been seen by the writer's office personnel. The opinion cited several earlier cases which defined the privilege, and quoted several of the definitions. It said, at 29-30:

"The general rules governing all conditional

privileges are, however, well-settled. A finding of conditional privilege conditionally negates the presumption of malice and shifts the burden to the plaintiff to show actual malice. *Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 255 A. 2d 332 (1969). Malice may be a jury question. As stated in *Fresh v. Cutter*, 73 Md. 87, 93-94, 20 A. 774, 775 (1890):

> 'It is a question for the Court whether the statement if made in good faith and without malice is thus privileged. But the plaintiff has the right notwithstanding the privileged character of the communication to go to the jury, if there be evidence tending to show actual malice * * *.' "

* * *

> "Absent a finding of express malice, a conditional privilege, if not abused, defeats the libel action. *Wetherby v. Retail Credit Co.*, 235 Md. 237, 241, 201 A. 2d 344, 347 (1964)."

The Court's conclusion on that issue was stated at 31-32. It said:

> "* * * in light of all the evidence, we find that there was a factual question as to the existence of a qualified privilege for Blankstein, Adler, Solomon, McManus, and Antonelli sufficient to go to the jury, and that the jury was properly instructed."

A careful reading of the instructions given by Judge Childs in the case before us shows that there was no departure from the principles of *Jacron* (which had not yet been decided), *Hanrahan*, and the earlier decisions of the Court of Appeals. He told the jury that the "law has found it proper to afford a Union or a group of people who have a common interest, what is known as the qualified privilege",[2]

---

2. Appellant does not contend that qualified privilege was not sufficiently defined.

and later said, "you may find or you may not find that there was a qualified privilege for the Union to say what it did in the Intercom, or you may find it went too far." The court also said, with respect to the extent to which some 2,000 copies of the paper were circulated, "it's up to you to determine whether or not this privilege was exceeded, and it is up to you to determine whether or not the one original publication and the additional publication exceeded the qualified privilege which may have existed between the Union, itself, and the Union members."

The instruction also submitted to the jury on the evidence, questions of actual malice, ill will, and publication with knowledge of falsity, or with reckless disregard of whether they were true or false, none of which was the subject of objection.

The evidence in this case was sufficient to permit the jury to find that the privilege was exceeded, by the extent to which the publication was disseminated, or that it was forfeited because it was abused.

It is entirely clear to us that when the trial judge in this case told the jury that it may find or may not find that there was a qualified privilege for the Union to say what it did, and when the Court of Appeals in *Hanrahan* said that there was a factual question as to the existence of a qualified privilege, the question was whether a privilege, conceded at the outset, still prevailed in the face of evidence that it was exceeded or abused.

There was no reversible error in the instructions relating to qualified privilege.

### Compensatory Damages

The objection noted by the appellant to the instructions as they related to damages was as follows:

> "The second objection is on the question of damages, as I understand the case, it was loss of reputation and consequent damages. We felt that

there was no evidence of loss of reputation, therefore, there could be no consequent damages. The consequent damages, as I understand it, has to relate back to some other loss, such as loss of reputation, and not that he felt and believed by the publication, not his own personal objection to the publication, but the reaction of others to the publication, which led to mental suffering and so on. And, therefore, we don't think that the jury has been properly instructed on that and we would urge that there have been proven, in fact, no damages that are compensable at all."

In effect, appellant's position, as preserved below and as argued here, is that the *sine qua non* in a defamation case is evidence of actual damage to reputation, and that no other element of damage may be considered unless it is shown to flow from the proven damage to reputation.

What the "Intercom" said about Mayo was a libel per se. It imputed to him misconduct related to his employment. Appellant does not contend otherwise. For obvious reasons, appellant could not, and did not, deny the publication. It relied solely upon the protection of qualified privilege.

In libel *per se*, damage to reputation is presumed, *General Motors Corp. v. Piskor*, 27 Md. App. 95, 117, 340 A. 2d 767 (1975). In awarding compensatory damages, however, a jury should look to evidence of actual injury.

The Supreme Court, in *Gertz v. Robert Welch, Inc., supra*, noted, at 349:

"The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred."

To reconcile state law with the command of the First Amendment, the Court held, at 349-50:

> "It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."

There was evidence at the trial below from which the jury could find that Mayo suffered actual injury, at least to the extent of personal humiliation, embarrassment, and mental anguish and suffering.

The trial judge did not err in refusing to instruct the jury that there was no evidence of compensable damage.

## Punitive Damages

Appellant next argues that the jury's award of damages of $1.00 was nominal, not compensatory, and precluded a verdict for punitive damages.

It is not clear how the point is preserved for appeal, unless it arises from the objection to the court's failure to instruct that there was no evidence of any damage. In any event, the contention is not a valid one. In *Shell Oil Co. v. Parker*, 265 Md. 631, 291 A. 2d 64 (1972), the Court of Appeals said, at 644:

> "To allow punitive damages where only a *technical* invasion of the plaintiff's rights existed would permit recovery of damages when, in fact, no compensable injury was proved. We therefore hold that to support an award of punitive damages in

Maryland there must first be an award of at least nominal compensatory damages."

The necessity of a compensatory damage base for punitive damages, in a tort involving malice, is unrelated to the distinction between common law malice, for most intentional torts, and the constitutional malice required in defamation cases by *New York Times Co. v. Sullivan*, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964), and *Gertz, supra*. For an illustration of the constitutional malice distinction, see *General Motors Corp. v. Piskor*, 277 Md. 165, 352 A. 2d 810 (1976), at 174-75.

## Prejudicial Instruction

In his instructions to the jury the judge referred to a contention in the case. He said:

"I believe that if you look thru the exhibits which were entered into evidence, the first complaint or written complaint in the step it was the Union's position that violation of Rule 11, and this is advisory only, you read it and see what it says, that violation of Rule 11 has been known to lead to firing of various employees and they felt that, so as to speak, of what was sauce for the goose, was sauce for the gander, and they felt that alteration or falsification of a record of this nature should also, I believe it was their theory, but you interpret it your own way, should lead to possible discharge of Mr. Mayo. And it's all there and you'll take these things back to the jury room for your deliberations and don't rely on my recollection, you see what it actually says itself, * * *."

An objection was made that the court's "implication" went well beyond any of the testimony, and could be inflammatory or prejudicial.

In addition to the general statement early in the instructions that

"* * * matters of fact are for your determination and should I mention the facts in discussing the case with you, and you disagree with my recollection of the facts, then please, use your own recollection and not mine because you are the ultimate deciders of the facts in this case.",

the court's subsequent reference to specific evidence was accompanied by further cautioning of the jury not to rely on the court's recollection.

There was no error.

*Judgment affirmed.*
*Appellant to pay costs.*