INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, LOCAL 1805, AFL-CIO *v.*
HENRY C. MAYO

[No. 45, September Term, 1977.]

*Decided December 6, 1977.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Bernard W. Rubenstein,* with whom were *Carl S. Yaller* and *Edelman, Levy & Rubenstein, P.A.* on the brief, for appellant.

*John A. Blondell* for appellee.

LEVINE, J., delivered the opinion of the Court.

In this case, we again examine the interplay between the Federal Constitution and the law of defamation, this time in the context of a labor dispute. This appeal is from a judgment for $1.00 compensatory damages and $5,000 punitive damages awarded appellee following a jury trial in the Circuit

Court for Anne Arundel County (Childs, J.). We granted certiorari after the Court of Special Appeals affirmed in *IBEW, Local 1805 v. Mayo,* 35 Md. App. 169, 370 A. 2d 130 (1977). We, too, now affirm.

The events leading directly to this controversy commenced in October 1973. Appellee was then a supervisor of factory inspection — and was thus a member of management — at the Anne Arundel County plant of the Westinghouse Electric Corporation, by whom he had been employed for 23 years. As such, it was appellee's responsibility to distribute weekly time cards each Friday afternoon to employees under his supervision, and then on the following Monday to review the completed cards for accuracy by comparing them with the attendance sheet which he had maintained during the prior week. Among the 33 employees under appellee's supervision was Wilton H. Sparks (Sparks), a member of Local 1805 (the union).

On Friday October 19, 1973, after being absent on the two preceding days, Sparks delivered to appellee his weekly time card on which he had designated Wednesday and Thursday as vacation days, by affixing opposite them the symbol "C," even though he had neither sought nor received prior approval from appellee to take a scheduled vacation on those two days. On the following Monday, appellee informed Sparks that plant policy prohibited employees from taking unscheduled vacations and that it would be necessary for the time card to reflect voluntary absences on the 17th and 18th. Sparks stood adamant, however, and refused to change the card. Following a discussion between shop stewards and management personnel, appellee was instructed by his supervisor to alter the time card so as to make it conform to company policy. Before doing so, however, appellee first notified Sparks and his shop steward, as well as the chief steward, of the proposed action. Then, appellee marked an "A," denoting voluntary absence, over the "C" which Sparks had originally inserted opposite the 17th and 18th.

Appellee's action in changing the time card escalated the dispute to the next grievance level under the collective bargaining agreement, which took the form of a written

complaint by Sparks' shop steward charging appellee with "altering or falsifying company documents." Specifically, the complaint alleged that under instructions from his supervisor, appellee "did falsify [the] time card by changing a C absence (vacation day) to an A absence for October 17th and 18th 1973, without employee W. Sparks permission." At the direction of his supervisor, appellee replied to the complaint by denying that the change had constituted a "falsification," claiming instead that he had merely fulfilled his responsibility in the circumstances.

While the various grievance procedures were being actively pursued, the November 1973 issue of "Intercom," a newspaper published by the union for its 2,000 members, was distributed. The publication routinely reported pending grievances, which, in this instance, included the following statement that precipitated this litigation:

> "Supervisor H. Mayo falsified employee's I.B.M. Weekly Time Card. Is a violation of Company plant rule #11. Submitted to the second step on 10-31-73, awaiting meeting."

Through his supervisors, appellee sought a retraction, but when these efforts proved futile, he filed a libel action against the union and various persons associated with the newspaper.[1]

At the trial, appellee, corroborated by testimony from his wife and married daughter, stated:

> "I was highly upset about the article because my character was good I thought with the company and relations with the people and management, and I just felt like I had publicly been called a crook, and I was upset about it."

When asked how this affected him, he replied: "I was up tight, if that word is all right, and pretty nervous . . . ." He also claimed to have suffered chest pains as a result of the

---

1. All of the individual defendants were eliminated by a directed verdict at the conclusion of the plaintiff's case. Thus, the judgment from which this appeal lies was entered only against the union.

experience for which he consulted a heart specialist. Since the episode, his "nerves have been worse" than they were prior to November 1973. He conceded, however, that he had sustained no damage to his reputation.

In this Court, as it did in the Court of Special Appeals, appellant urges reversal on two grounds. First, it contends that the trial court erred by failing to instruct the jury that the union, as a matter of law, enjoyed a qualified privilege in reporting the grievance. Secondly, appellant urges that appellee could not recover compensatory damages because he presented no proof of damage to his reputation; nor, absent a proper award of compensatory damages, could he recover punitive damages.

### (1)

Among the defenses asserted by appellant at trial was that of qualified privilege — presumably on the theory that members of a labor union have a common interest in communications pertaining to their activities. *See generally* Restatement (Second) of Torts § 596, Comment e at 277 (1977); Annot., 60 A.L.R.3d 1041 (1974). Accordingly, the trial judge instructed the jury upon this defense in some detail, in the course of which he stated:

> "But you *may* have or you *may* find *or* you *may not* find that there was a qualified privilege for the union to say what it did in the Intercom, or you may find it went too far. . . . [A]nd it's up to you to determine whether or not this privilege was exceeded . . . ." (emphasis added).

The effect of the italicized language, appellant contends, was to permit the jury to decide not only whether the qualified privilege had been lost or defeated, but whether the privilege existed at all. The trial court erred, then, appellant argues, since, as we recently observed in *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 600, 350 A. 2d 688 (1976), the question whether a defamatory communication enjoys a qualified privilege is one of law, the jury's role being limited to a determination of

whether the privilege has been forfeited.[2] Thus, by its instructions, the court erroneously permitted the jury to find that the defendant was not protected by a qualified privilege, rather than decide only whether the plaintiff had sustained the burden of overcoming the privilege by "prov[ing] that the defendant acted with a reckless disregard for the truth . . . ."

The argument advanced by appellant proceeds on the false assumption that appellee was only required to meet the negligence standard adopted by us in *Jacron Sales Co. v. Sindorf,* 276 Md. at 596-97, in establishing his right to recover for the alleged defamation. There we held that reckless disregard as to truth or falsity is necessary to defeat a qualified privilege; proof of mere negligence will not suffice. *Id.* at 599-600. In short, appellant contends that it was prejudiced by the instruction permitting the jury to find no qualified privilege, since, to defeat such a privilege, appellee could properly have prevailed only by sustaining a more demanding burden than the negligence which he was ostensibly required to prove.

In our view, however, it is unnecessary to decide whether the trial court erred in permitting the jury to determine the existence of appellant's asserted qualified privilege. Appellant's argument completely overlooks the very theory on which this case was tried, at the union's own insistence. The defect in appellant's position is that appellee, despite his status as a private plaintiff, actually was required to show more than mere negligent conduct in proving the defamation. Indeed, it was at appellant's own behest — in the face of stout resistance from appellee — that the trial court instructed the jury that appellee could recover only if the statement in controversy was published with knowledge of its falsity or with reckless disregard as to whether it was true or false. In giving the requested instruction, the trial court was apparently cognizant of the Supreme Court holdings in *Linn v. Plant Guard Workers,* 383 U. S. 53, 65, 86 S. Ct. 657, 15

---

2. In responding to the same contention, the Court of Special Appeals stated that the issue was largely one of semantics in light of the correct action of the trial court — under the evidence — in submitting to the jury the question whether the privilege had been "exceeded or abused." IBEW, Local 1805 v. Mayo. 35 Md. App. 169, 178, 370 A. 2d 130 (1977).

L.Ed.2d 582 (1966), and *Letter Carriers v. Austin,* 418 U. S. 264, 280-82, 94 S. Ct. 2770, 41 L.Ed.2d 745 (1974), to the effect that the standard of knowing falsity or reckless disregard for truth adopted in *New York Times Co. v. Sullivan,* 376 U. S. 254, 280, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964), for defamation actions brought by public officials was also applicable to defamatory statements published in labor disputes protected by federal law.[3]

The net effect of the jury verdict, in light of the requirement imposed by the court's instructions, was to establish that appellant had published the statement either with knowledge of its falsity or with reckless disregard as to whether it was true or false. Prior to the advent of *New York Times,* Maryland had followed the common law rule that a qualified privilege could be forfeited by "express malice" or "actual malice," variously defined in our cases as lack of good faith, ill-will, hostility or hatred. *Evening News Co. v. Bowie,* 154 Md. 604, 611, 141 A. 416 (1928); *Deckelman v. Lake,* 149 Md. 533, 536, 131 A. 762 (1926). But more recently in *Stevenson v. Baltimore Club,* 250 Md. 482, 486-87, 243 A. 2d 533 (1968), we took a modified view of the requirement:

> "The privilege may be lost, however, if the plaintiff in a defamation case can show malice, which in this context means not hatred or spite but rather a *reckless disregard of truth,* the use of unnecessarily abusive language, or other circumstances which would support a conclusion that

---

3. Appellant has not contended on appeal that the evidence was legally insufficient to support a verdict of knowing falsity or reckless disregard for truth under the *New York Times* standard. At the trial, appellant did present this challenge — unsuccessfully — during its motion for directed verdict at the end of the plaintiff's case. But it failed to renew the motion at the close of all the evidence, and thereby withdrew it. Maryland Rule 552 b. Thus, there is no occasion for us to make an independent examination of the record to assure ourselves that the statement published here was not insulated from a libel award by the First Amendment. Letter Carriers v. Austin, 418 U. S. 264, 282, 94 S. Ct. 2770, 41 L.Ed.2d 745 (1974); Greenbelt Pub. Assn. v. Bresler, 398 U. S. 6, 11, 90 S. Ct. 1537, 26 L.Ed.2d 6 (1970), *rev'g,* 253 Md. 324, 252 A. 2d 755 (1969).

Nor, since it was in response to appellant's own request that the trial court applied the *New York Times* standard to this case, do we review the ruling that the defamatory statement here arose out of a labor dispute protected by federal law.

the defendant acted in an ill-tempered manner or was motivated by ill-will." (emphasis added).

*Accord, Jacron Sales Co. v. Sindorf,* 276 Md. at 600; *Orrison v. Vance,* 262 Md. 285, 295, 277 A. 2d 573 (1971).

Consequently, even assuming that the trial court failed to instruct the jury with the necessary precision that a qualified privilege existed as a matter of law, appellant suffered no harm, since the verdict reflected a finding that appellee defeated the privilege, in any event, by proving knowing falsity or reckless disregard of truth.

(2)

What we have said is largely dispositive of appellant's remaining contentions: That no libel occurred because appellee failed to prove any damage to his reputation; that absent such damage, he cannot, in conformity with the *New York Times* standard, recover compensatory damages despite his proof of humiliation, embarrassment, and mental anguish; and that lacking entitlement to compensatory damages, appellee cannot recover punitive damages.

Clearly, the Federal Constitution presented no barrier to the jury award in this case. In *Gertz v. Robert Welch, Inc.,* 418 U. S. 323, 350, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held that in cases where the *New York Times* test of knowing falsity or reckless disregard for truth is *not* met, provided a standard of negligence is satisfied, states may permit recovery by private persons for "actual injury," but not presumed or punitive damages. Such actual injury is not confined to out-of-pocket loss, but may include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Id.* Where, however, the *New York Times* standard is met, as it was here, presumed and punitive damages may be awarded. *See General Motors Corp. v. Piskor,* 277 Md. 165, 174-75, 352 A. 2d 810 (1976). More recently, in *Time, Inc. v. Firestone,* 424 U. S. 448, 460, 96 S. Ct. 958, 47 L.Ed.2d 154 (1976), a contention closely resembling that made here was advanced in the context of proof that did not meet the *New York Times*

test; nevertheless the Court made it clear that compensatory damages could be awarded despite the absence of injury to reputation, provided the *Gertz* test of negligence was satisfied. Clearly, if the absence of injury to reputation will not prevent an award of compensatory damages where mere negligence is established, it will not do so where, as here, the *New York Times* standard of malice is met.

As it happened, appellee presented evidence of mental anguish, embarrassment and humiliation. In any event, because appellee met the *New York Times* test of knowing falsity or reckless disregard of truth, the First Amendment offered no obstacle to the recovery of presumed and punitive damages. Appellee could then, consistent with the Federal Constitution, recover both compensatory and punitive damages absent proof of actual damages of any kind.[4] We hold, therefore, that he may recover such damages despite the absence of any injury to his reputation.

*Judgment affirmed; appellant to pay costs.*

---

4. Appellant's sole contention here is that federal constitutional law precluded the damages awarded appellee, absent proof of actual injury to his reputation. Since the union does not attempt to argue that, constitutional considerations aside, state law would nevertheless have barred the damage award returned here, we do not reach that question.